KUSKIN, J.T.C.
Plaintiff, Town of Secaucus, challenges the exemption from local property taxation granted for tax years 1998 and 1999 by defendant City of Jersey City (“Jersey City”) to defendant TPI Urban Renewal Corporation (“TPI”) pursuant to N.J.S.A 40:55C-65, a provision of the Fox-Lance Law, N.J.S.A. 40:55C-42 to -76. The *18 Fox-Lance Law was repealed in 1991 and replaced by the Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 to -20 (the “Long Term Law”).[1]
Plaintiff previously attempted to challenge tax exemptions and abatements granted by Jersey City pursuant to the Fox-Lance Law and other laws relating to development and redevelopment projects in blighted areas. In Secaucus v. Hudson County Board of Taxation, 17 N.J.Tax 215 (Tax 1998), plaintiff sought revision of the 1997 county equalization table for Hudson County, contending that certain tax exemptions and abatements granted by Jersey City, pursuant to those laws, were invalid. Because the properties granted abatement or exemption were excluded from Jersey City’s aggregate assessed value for county equalization purposes, the impact of the exemptions and abatements was to decrease Jersey City’s share of the county tax burden and increase plaintiffs share. The Tax Court held that the granting of exemptions and abatements could not be challenged in the context of a county equalization proceeding. Secaucus then filed these appeals pursuant to N.J.S.A. 54:3-21, which permits an appeal by “a taxing district which may feel discriminated against by the assessed valuation of property ... in another taxing district in the county....” Plaintiff and both defendants have moved for summary judgment.[2]
I.
Facts
The following facts relating to the motions are not in dispute. ■ TPI was incorporated on March 1, 1989. Its Certificate of Incor *19 poration described its corporate purpose as “to operate under the Urban Renewal Corporation Association Law of 1961 [ (commonly known as the Fox-Lance Law) ] ... and to initiate and conduct projects for the clearance, replanning, development and re-development of blighted areas in municipalities.... ” On March 28, 1989, TPI submitted to Jersey City an application seeking tax abatement or exemption under the Fox-Lance Law for a building and related improvements to be constructed by TPI on approximately forty-two acres of land located in a section of Jersey City known as the Greenville Industrial Redevelopment Area, which Jersey City had previously declared a blighted area.
The application documents disclosed that TPI would lease the land from CRC Properties, Inc. and Consolidated Rail Corporation (collectively “Conrad”) under a long term ground lease (the “Ground Lease”).[1] The construction would consist of a 245,000 square foot industrial building, and the land and building (the “Project”) would be used by Tropicana Products Sales, Inc. a corporation related to TPI, which would “operate the facility” as its principal processing and distribution center serving the northeastern region of the United States. TPI, however, would “remain responsible for the maintenance of the project during the term of the abatement.” The application stated as follows concerning the necessity for tax abatement:
Tax abatement is required in order to make the project feasible. TPI Urban Renewal Corporation cannot support the cost of acquiring the site, the construction of the facility and the tax burdo associated therewith if the taxes are not abated
[T|ax abatement is a fundamental premise of the project In the absence of tax abatement, the proposed distribution and processing center cannot be located in Jersey City.
The application estimated the cost of the Project at $43,934,000, and proposed payment in lieu of taxes of an annual service charge equal to 2% of total project cost or $878,680, as compared to $86,000 in taxes then being generated by the property, and as compared to taxes of $1,340,865 which would be payable for the completed Project assuming the 1988 tax rate for Jersey City ($3.052 per $100 of assessed valuation) and an assessment at 100% of cost. The initial estimated difference, therefore, between the *20 payment in lieu of taxes and a full local property tax obligation was $462,185 per year.
On June 8, 1989, Jersey City’s municipal council adopted an ordinance (the “Ordinance”) authorizing a fifteen-year tax abatement [3] agreement with TPI pursuant to the Fox-Lance Law. The Ordinance contemplated that TPI would pay, in lieu of taxes, an annual service charge equal to 2% of the total project cost for each of the first five years of the fifteen year term of the abatement, then 2.05% for the sixth year of the term, with annual increases thereafter of .05% per year to a maximum of 2.5% during the fifteenth year of the term. The Ordinance further contemplated that the initial payment in lieu of taxes would be approximately $898,000.
Pursuant to the Ordinance, on July 13, 1989 TPI and Jersey City entered into a financial agreement (the “Financial Agreement”) which incorporated the applicable provisions of the Ordinance, including those relating to the annual service charge. One paragraph of the Financial Agreement stated that the agreement “shall be governed by the provisions of the Urban Renewal Corporation and Association Law of 1961 (N.J.S.A. 40:55C-40, et seq.) ....” Jersey City’s business administrator signed the Financial Agreement on behalf of the City and an assistant corporation counsel for the City approved the document as to “form and legality.” In reliance on the Ordinance and Financial Agreement, TPI obtained site plan approval for the Project in November or December 1989 and entered into the following agreements: 1) on January 2, 1990, the Ground Lease; 2) in November 1990, a Developer’s Agreement with Jersey City; and 3) on November 8, 1990, a Design and Construction Contract for the project with Sverdrup Corporation.
In May 1991, TPI subleased the property covered by the ground lease to Greenville Holding Corp. (“Greenville”), a related corporate entity. The sublease was for a term expiring one day before *21 the expiration of the Ground Lease and imposed on Greenville most, but not all, of the obligations of TPI under the Ground Lease. Although the sublease apparently was intended to include a lease to Greenville of the buildings and improvements to be constructed by TPI, the document does not expressly so provide. Also in May 1999, Greenville entered into a license agreement with Tropicana Products Sales, Inc., under which Greenville licensed Tropicana Products Sales to use the land and improvements for a term of one year, with automatic successive one year renewal periods. The licensee’s obligations under the license agreement were as follows:
Licensee shall compensate licensor for the license herein granted by making timely payment for real estate taxes, insurance and such other items and in such amounts as are agreed to by the licensor and licensee from time to time and shall be paid by licensee to licensor on a monthly basis or on such other basis as the party may agree to from time to time. Licensee shall also maintain the Property in such manner as agreed upon, from time to time, by licensor and licensee.
The licensee was also obligated to provide certain insurance coverage.
On August 9, 1991, the Jersey City Building Department issued temporary Certificates of Occupancy for the Project, and the Project was deemed complete on September 1, 1991.
II.
Contentions of the Parties
Plaintiff contends that the Project does not qualify for tax exemption for tax years 1998 and 1999 for the following reasons:
1 The Ordinance and Financial Agreement provide for animal seivice charges in excess of the amount permitted by N.J.S.A. 40:55C-65 and its successor, N.J.S.A. 40A:20-12. Specifically, plaintiff contends that such statutes limit, the annual sendee charge to 2% of total project costs, and, therefore, the provisions for increase m the annual sendee charge violate the statutes.
2. Jersey City has failed to certify that the Financial Agreement was entered into and was in effect for the tax years 1998 and 1999 as required by the introductory paragraph to N.J.S.A 40:55C-65 and the similar paragraph in N.J.S.A. 10A:20-12.
3. Under the provision of the New Jersey Constitution authorising tax abate-ments or exemptions for redevelopment of blighted areas, the entity obtaining, and party to, the tax exemption or abatement agreement with the municipality *22 must “enjoy” the exemption. Because of the subleasing and licensing arrangements described above, TPI is not enjoying the benefits of the exemption.
Defendants respond to plaintiffs contentions as follows:
A. The Legislature did not intend 2% to be a cap on what the municipality could receive as a payment in lieu of taxes for a development such as the Project, and, in any event, the annual service charge contained in the Ordinance and Financial Agreement exceeds 2% by only minor amounts during years six through fifteen of the term of the exemption.
B. The certification requirements of the statute were satisfied by the signing of the Financial Agreement by Jersey City’s business administrator and approval of the document by an assistant corporation counsel. Any further certification requirements have been satisfied by the assessor’s annual certification to the county board of taxation that only authorized exemptions have been granted, which certification followed inquiry by the assessor made to the Tax Collector’s Office, Office of Abatement Management to confirm that no default existed under the Financial Agreement.
C. Neither the New Jersey Constitution nor the applicable statutes prohibit subleasing or licensing of a project granted tax exemption under the Fox-Lance Law or Long Term Law. Even if such a prohibition or limitation existed, it would be inapplicable to the circumstances before the court, where all of the entities involved in the subject property are related and where TPI continues to have obligations with respect to the Project under the Ground Lease.
D. Plaintiffs appeals are not timely because any challenge to the tax exemption granted to TPI had to be filed within forty-five days after adoption of the Ordinance. Even if plaintiffs appeals are timely under N.J.S.A 54:3-21, the appeals should be dismissed under the doctrines of laches and estoppel. *23 shall be claimed and allowed in the same or a similai* manner as in the case of other real property exemptions, and no such claim shall be allowed unless the municipality wherein the property is situated shall certify that a financial agreement with an urban renewal corporation or association for the development 01* redevelopment of the property has been entered into and is in effect as required by this act. In the event that an exemption status changes during a tax year, the procedure for the apportionment of the taxes for said year shall be the same as in the case of other changes in tax exemption status during the tax year.
*22 I will address defendants’ contentions as to the applicability of the forty-five day time limit and laches and estoppel first. If I determine that such time limit or either doctrine applies to plaintiffs appeals, I need not address the underlying substantive issues.
III.
Filing Deadline
Discussion of the time limit for appeal of an exemption under the Fox-Lance Law or Long Term Law must begin with an examination of the statutory provisions applicable to this issue.
N.J.S.A. 40:55C-65 provides that an exemption under the Fox-Lance Law
*23 The quoted language appears in almost identical form in N.J.S.A. 40A:20-12. Similar language also appeared in N.J.S.A. 40:55C-97 (a provision of the Urban Renewal Nonprofit Corporation Law of 1965, N.J.S.A. 40:55C-77 to -108, which was repealed and replaced by the Long Term Law). This statute was interpreted by the Tax Court in Morris Township v. LF Associates, 10 N.J.Tax 240 (Tax 1988), in which Morris Township appealed the granting by the Town of Morristown of a tax abatement under the Urban Renewal Non-Profit Corporation Law of 1965. The defendants argued that the appeal was untimely because it should have been filed as an action in lieu of prerogative writs in the Superior Court, Law Division, within the forty-five day time limit for filing such an action contained in R. 4:69-6(a). Judge Lasser of the Tax Court determined that the court had jurisdiction of the subject matter of the complaint and stated as follows:
My finding that the Tax Court has jurisdiction to review the issue of tax exemption carries with it a finding that the deadline for contesting the tax exemption to the Morris County Board of Taxation was August 15, 1988. N.J.S.A. 54:3-21 [ (which date has since been changed, by statutory amendment, to April 1)], and the deadline for filing a complaint in the Tax Court to contest the judgment of the Moms County Board of Taxation was forty-five days after the date of the determination of the County Board of Taxation, R. 8:4-1(a)(2). Based on these filing requirements, the complaint m this case was timely filed with the Tax Court.
I note that even if this complaint were required to be filed under R. 4:69, the Section 6(c) provisions permitting the enlargement of time would be applicable because of the important public interest involved.
[Id. at 246-47 (footnote omitted).]
See also, Tru Urban Renewal Corp. v. Newark, 11 N.J.Tax 63, 70 (Tax 1990).
I conclude that Judge Lasser’s interpretation of language in N.J.S.A. 40:55C-97 is applicable to N.J.S.A. 40:55C-65 and N.J.S.A. 40A:20-12. The statutory filing deadlines applicable to plaintiffs appeals, therefore, were April 1, 1998 and April 1, 1999, *24 respectively, as established by N.J.S.A. 54:3-21. Consequently, I reject defendants’ contentions that the forty-five day time limit appearing in R. 4:69-6(a) is applicable to the appeals.
IV.
Laches and Estoppel
Defendants acknowledge that plaintiffs appeals were timely filed under N.J.S.A. 54:3-21, but contend that the appeals nevertheless should be dismissed under the doctrines of laches and estoppel. In Lavin v. Board of Education of Hackensack, 90 N.J. 145, 447 A.2d 516 (1982), the Supreme Court defined laches as “ ‘such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity.’ ” Id. at 151, 447 A.2d 516 (quoting from 2 Pomeroy Equity Jurisprudence § 419 at 171-72 (5th ed.1941)). The Court then articulated the following factors as relevant to a claim of laches:
The length of delay, reasons for delay, and changing' conditions of either or both parties during the delay are the most important factors that a court considers and weighs. The length of the delay alone or in conjunction with the other elements may result in laches. It is because the central issue is whether it is inequitable to permit the claim to be enforced that generally the change in conditions or relations of the parties coupled with the passage of time becomes the primary determinant. .. Inequity, more often than not, will turn on whether a party has been misled to his harm by the delay.
[Id. at 152-53, 447 A.2d 516 (citations omitted) (footnote omitted).]
In a footnote to the quoted language, the Court stated that laches could be applied even when the statute of limitations applicable to a claim had not expired. Id. at 152 n. 1, 447 A.2d 516.
In order for laches to apply, the party asserting the doctrine must have “a justifiable reason to believe that the alleged rights are meritless or have been abandoned” and, as a result of a change in conditions during the delay in assertion of the rights, “it would be unjust to permit those rights now to be asserted.” Dorchester Manor v. New Milford Bor., 287 N.J.Super. 163, 172, 670 A.2d 600 (Law Div.1994), aff'd, 287 N.J.Super. 114, 670 A.2d 576 (App.Div.1996) (citations omitted). The length of the delay in *25 assertion of a party’s rights is determined with reference to “the date when alleged legal injury occurred.” Enfield v. FWL, Inc., 256 N.J.Super. 502, 520, 607 A.2d 685 (Ch.Div.1991) (citation omitted).
A party asserting laches must establish that the other party either knew or, with reasonable diligence and vigilance, could have known of such date of occurrence. Id. at 521, 607 A.2d 685. “ ‘Laches is not excused by simply saying T did not know’. The test is not what the plaintiff knows but what he might have known by the use of the means of information within his reach with the vigilance which the law requires of him.’ ” Cameron v. Penn Mutual Life Ins. Co., 116 N.J.Eq. 311, 314, 173 A. 344 (Ch.1934) (citation omitted). A delay in asserting a legal right or claim can be excused if the plaintiff can establish
justifiable ignorance of the facts creating a cause of action. However, once the facts become known to the party, he must use “reasonable diligence to enforce his nght.” Generally, where a plaintiff relies on ignorance of the facts as an excuse for delay in asserting his right, he must show why he had no knowledge of any facts that would have put him on inquiry, as well as show how and when he first acquired knowledge of the facts which gave rise to the claim.
[Enfield v. FWL, Inc., supra, 256 N.J.Super. at 522, 607 A.2d 685 (citations omitted).]
In Middletown Township Policemen’s Benevolent Association, Local No. 124 v. Middletown Township, 162 N.J. 361, 744 A.2d 649 (2000), the Supreme Court adopted the following description of estoppel:
The essential principle of the policy of estoppel is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct. An estoppel . may arise by silence or omission where one is under a duty to speak or act. It has to do with the inducement of conduct to action or non-action. One’s act or acceptance may close his mouth to allege or prove the truth. The doing or foreboaring to do an act induced by the conduct of another may work an estoppel to avoid wrong or injury ensuing from reasonable reliance upon such conduct. The repudiation of one’s act done or position assumed is not permissible where that course would work injustice to another who, having the right to do so, has relied thereon.
[Id. at 367, 744 A.2d 649 (citation omitted).]
This description is applicable to a claim of estoppel against a public entity, where “the party claiming the estoppel must demonstrate detrimental reliance on the action or inaction of the ... *26 entity.” Marrinan v. Director, Div. of Taxation, 17 N.J.Tax 47, 57 (Tax 1997).
The quoted definitions of laches and estoppel indicate the similarity of the two doctrines. Here, defendants contend that either or both doctrines are applicable to preclude plaintiffs appeals. They assert, as the factual bases for application of one or both doctrines, the following: 1) the adoption of the Ordinance on June 8, 1989 at a public meeting on proper notice; 2) the signing of the Financial Agreement on July 13, 1989; 3) TPI’s entry into the Ground Lease on January 2, 1990; 4) TPI’s construction of the Project which was completed on September 1, 1991 at a cost of approximately $45,000,000; and 5) the delay of more than nine years in the institution of plaintiffs challenge to TPI’s tax exemption. Defendants further contend that plaintiff had actual knowledge of the granting of the subject tax exemption to TPI, and cite North Bergen Township v. Jersey City, 232 N.J.Super. 219, 556 A.2d 1255 (App.Div.), certif. denied, 117 N.J. 632, 569 A.2d 1334 (1989), in which North Bergen and the Town of Secaueus challenged a 1985 tax abatement granted by Jersey City, as evidencing plaintiffs monitoring of tax abatements granted in Jersey City. Defendants argue that, under these circumstances, even if the April 1 deadline for the filing of tax appeals is applicable to plaintiffs appeals, laches or estoppel should be applied because granting relief to plaintiff would be unfair and inequitable.
In response to the defendants’ assertion that its appeals are barred by laches or estoppel, plaintiff asserts that neither doctrine is applicable because, as acknowledged by defendants, the appeals were filed in a timely fashion under N.J.S.A. 54:3-21. Plaintiff distinguishes between a challenge to the basic validity of the Ordinance and Financial Agreement and a limited challenge to TPI’s right to exemption for tax years 1998 and 1999 only. Plaintiff argues that it does not seek to undo or nullify exemptions granted for the years preceding or succeeding 1998 and 1999.
Plaintiff cites several court decisions indicating that laches and estoppel are rarely applied to governmental bodies, but *27 concedes that, in appropriate circumstances, either doctrine can be applied to a governmental body or agency. Plaintiffs concession is consistent with the holding of the New Jersey Supreme Court, based on well-established precedent, that “equitable estoppel will be applied in the appropriate circumstances [against a governmental entity] unless the application would ‘prejudice essential governmental functions.’ ” Middletown. Tp. Policemen’s Benevolent, Ass’n., Local No. 124 v. Middletown Tp., supra, 162 N.J. at 367, 744 A.2d 649. The same principle applies to laches. East Orange v. Livingston Tp., 102 N.J.Super. 512, 522, 246 A.2d 178 (Law Div.1968), aff'd, 54 N.J. 96, 253 A.2d 546 (1969).
In deciding whether to apply laches or estoppel the court must weigh carefully all of the factors articulated in the foregoing decisions, and, ultimately, must determine whether application of either doctrine is equitable. Generally, a factual hearing is required. See Dorchester Manor v. New Milford, Bor., supra, 287 N.J.Super. at 173, 670 A.2d 600. Because of the nature of the issues in these appeals, certain policy considerations are also relevant to a determination of whether laches or estoppel applies to plaintiffs appeals. If plaintiff is successful on the merits, the share of the Hudson County tax burden borne by each municipality in the county, other than Jersey City, will be reduced. In a very real sense, therefore, plaintiff seeks to enforce rights of all taxpayers in the county other than Jersey City taxpayers. Under these circumstances, the court should hesitate to apply laches or estoppel, see Garrou v. Teaneck Tryon Co., 11 N.J. 294, 307, 94 A.2d 332 (1953), even though application of either doctrine to plaintiff’s appeals will not prejudice any essential governmental functions.
Defendants and the amicus curiae assert that the public policy in favor of development and redevelopment of blighted areas should be an important factor in the court’s analysis. Specifically, they note, and plaintiff does not dispute, that, under the provisions of Art. 8, § 3, ¶ 1 of the New Jersey Constitution, the development and redevelopment of blighted areas is specifically declared to be a public purpose, and the Legislature has made *28 specific findings as to the public purpose of such activity in enacting the Fox-Lance Law and the Long Term Law. I acknowledge that this public policy is entitled to consideration in the court’s determination of the issues. However, co-existing with the policy in favor of development and redevelopment of blighted areas is the strong public policy that exemptions are to be granted sparingly and only to those who comply strictly with the applicable requirements for granting the exemption. Princeton Univ. Press v. Princeton Bor., 35 N.J. 209, 172 A.2d 420 (1961).
The general rule in interpreting tax exemptions is that such exemptions are to be strictly construed because an exemption from taxation is a departure from the equitable principle that everyone should bear his just and equal share of the public lax burden. Taxation is the rule, and exemption is the exception to the rule.
[Morris Tp. v. L.F. Assocs., supra, 10 N.J.Tax at 248.]
The right of appeal conferred by N.J.S.A. 54:3-21 upon taxpayers with respect to them properties, and upon taxpayers and taxing districts with respect to properties of others, is a mechanism to effectuate a just and equitable distribution of the tax burden.
The policy concerns relating to fair distribution of the tax burden and limitation of exemptions are sufficiently strong that an exemption can be denied even where the parties have acted to them detriment in reliance on the exemption. In Morris Township. v. LF Associates, supra, 10 N.J.Tax 240, LF Associates was initially granted a tax exemption under the Urban Renewal and Nonprofit Corporation Law of 1965 with respect to a parking garage beneath a large office building. When AT & T, the major tenant in the office building, announced its intention to relocate, Morristown agreed to extend the tax exemption to the office building, thus enabling LF Associates to offer AT & T an attractive rent. In reliance on a written agreement with Morristown extending the exemption, LF Associates entered into a lease agreement with AT & T at a lower rental than AT & T was paying previously. Notwithstanding this financial reliance, the court invalidated the exemption because it was not granted in accordance with the applicable statutory provisions.
In applying the factors and policy considerations discussed above, I accept defendants’ contention that the significance *29 of any delay in plaintiffs assertion of its rights must be determined using the date of adoption of the Ordinance as the date of occurrence of the “alleged legal injury.” Enfield v. FWL, Inc., supra, 256 N.J.Super. at 520, 607 A.2d 685. Although the Financial Agreement resulted from the Ordinance, the signing of the Agreement was in no respect a public event. TPI’s signing of the Ground Lease with Conrail, entry into a construction contract, and construction of the Project were all done in reliance on the Ordinance. As of the date of one or more of these post-Ordinanee events, therefore, the applicability, if any, of laches and estoppel had already occurred because the harm, if any, to TPI as a result of plaintiff’s failure to act also had already occurred. Consequently, the time gap between the date by which plaintiff should have acted in order to preclude any claim of laches or estoppel (I need not decide whether that date was in 1989, 1990 or 1991) and the filing dates of plaintiffs 1998 and 1999 appeals is of no real significance in deciding whether the appeals are barred by laches or estoppel.
Tax assessments are imposed annually, N.J.S.A. 54:4-23, and are subject to annual appeals. N.J.S.A. 54:3-21. A failure to file an appeal in one year will not preclude an appeal in a later year. Laches and estoppel normally are not applicable to the appeals process, even to appeals challenging an exemption which has been in effect for a period of years. The facts before me, however, are significantly different from those involved in the normal tax appeal. Generally, a property owner makes improvements to a property, and the assessor then determines the amount of the assessment on the property or whether the property qualifies for exemption. The property owner has no binding agreement from the assessor or municipality as to the assessment status of the property. An assessment can be changed annually, and an exemption granted and unchallenged for one year can be revoked or challenged the next year.
Here, before constructing the Project, TPI received formal confirmation and formal agreement from Jersey City, pursuant to the Fox-Lance Law, that the improvements included in the Project would be tax exempt for fifteen years. The application for the *30 exemption stated that the Project could not, and would not, be built unless the exemption was granted. Once the Ordinance was adopted and the Financial Agreement signed, TPI could reasonably act on the basis of an expectation that the tax exemption authorized by the Ordinance and set forth in the Financial Agreement would remain in effect for fifteen years, absent lawful termination of the Financial Agreement. This process reflects a degree of reliance on the granting of a tax exemption far different from the situation where a building is constructed and qualification for exemption is then decided by the tax assessor, or where the assessor informally agrees, before construction commences, to grant an exemption. In those circumstances, the taxpayer is chargeable with knowledge that the exemption is subject to rede-termination from year to year, that any agreement with the assessor is not enforceable, and that the exemption is subject to annual appeal by another taxpayer, by the municipality in which the property is located, or by another municipality in the county. N.J.S.A. 54:3-21.
Based on the preceding discussion, I conclude that, even though lachqjs and estoppel are not applicable to appeals of assessments imposed, or exemptions granted, by a tax assessor, both doctrines should be applicable to appeals from exemptions granted pursuant to the Fox-Lance Law or Long Term Law, but with limitations reflective of the policy concerns discussed above. An equitable balancing of (i) defendant’s reliance interest with (ii) plaintiffs statutory right of appeal, and of (iii) the public policy in favor of development and redevelopment of blighted areas with (iv) the public policy of equitable distribution of the tax burden and restriction of exemptions, is achieved if laches or estoppel is applicable to plaintiffs appeals only if defendants establish by a preponderance of the evidence that plaintiff had timely actual knowledge of the adoption of the Ordinance or timely actual knowledge of facts sufficient to impose on plaintiff a duty of inquiry as to adoption of the Ordinance.
Plaintiffs participation as a party plaintiff in North Bergen Township v. Jersey City, supra, 232 N.J.Super. 219, 556 A.2d *31 1255, does not establish any actual knowledge by plaintiff of TPI’s filing of an exemption application or the adoption of the Ordinance and is not sufficient to impose any duty of inquiry, on plaintiff as to either such event. Although the Appellate Division opinion is dated 1989, that litigation involved a tax abatement granted to a totally unrelated taxpayer almost four years before Jersey City considered TPI’s application.
Publication of the Ordinance also is insufficient to establish actual knowledge thereof by plaintiff or to impose on plaintiff a duty of inquiry, unless plaintiff had timely actual knowledge of the publication. The statutory requirement as to publication of notice of adoption of ordinances, as in effect at the time the Ordinance was adopted, was in relevant part as follows:
Every ordinance after being introduced and having passed a first reading, which first reading may be by title, shall be published at least once in a newspaper published and circulated in the municipality, if there be one, and if not, in a newspaper printed in the county and circulating in the municipality, together with a notice of the introduction thereof and the time and place when and where it will be further considered for final passage.
[N.J.S.A. 40:49-2a (emphasis added).]
See N.J.S.A. 40:53-2 which also requires publication of ordinances by public notices only “in the municipality.” The statutory requirement was (and continues to be) only that the published notice be circulated in the municipality. “Notwithstanding their variety, [various statutory requirements for newspaper publication] have the same general tenor and clearly seek to achieve the same end: wide dissemination of notice throughout the municipality affected, so that citizens and interested parties may have an opportunity to become informed and to be heard.” Plainfield v. The Courier News, 72 N.J. 171, 182, 369 A.2d 513 (1976) (emphasis added). As a result, mere publication of an ordinance in compliance with the statute is an insufficient basis to charge another municipality with knowledge of the ordinance or its proposed adoption, because compliance with the statutory publication requirement does not assure circulation of the published ordinance in another municipality. Furthermore, the focus in the statutory publication requirement on the municipality affected suggests, and I so conclude, that it is inappropriate and inequitable to impose on plaintiff a duty to *32 monitor, on a daily basis, every newspaper circulating in Hudson County in order to ascertain whether another municipality proposes any act or action which could affect plaintiffs rights and interests.
Based on the preceding discussion, a factual hearing is essential before a determination can be made as to whether laches or estoppel should apply to plaintiffs appeal. I will apply either doctrine only if defendants prove that:
1) at a time when plaintiff could have filed a timely challenge to the Ordinance, plaintiff had actual knowledge of the adoption of the Ordinance or had actual knowledge of such facts as to impose on it a duty of inquiry concerning the Ordinance, and either
2) defendants were “misled to [their] harm by the delay” in plaintiffs assertions of its claims, Lavin v. Bd. of Educ. of Hackensack, supra, 90 N.J. at 153, 447 A.2d 516 (as to laches), or
3) defendants “with good reason and in good faith" relied upon plaintiffs failure to act sooner. Middletown Tp. Policemen’s Benevolent Ass’n. v. Middletown Tp., supra, 162 N.J. at 367, 744 A.2d 649 (as to estoppel).
V.
Annual Service Charge
I must now consider defendants’ summary judgment motions based on grounds other than laches and estoppel, as well as plaintiffs motion for summary judgment. Plaintiff contends that summary judgment should be granted invalidating the exemption granted to TPI for tax years 1998 and 1999 because the annual service charge set forth in the Financial Agreement exceeds the amount permitted under N.J.S.A 40:55C-65c and N.J.S.A. 40A:20-12b(1). Defendants seek summary judgment declaring that 2% is not an absolute maximum and that the Legislature intended to provide flexibility to municipalities in negotiating the amount of an annual service charge based on total project cost. Defendants further contend that the deviation from 2% required by the Financial Agreement is minor and insufficient to affect the validity of the Ordinance or Financial Agreement.
The provisions of the Fox-Lance Law relating to the annual service charge were contained in N.J.S.A. 40:55C-65. The applicable provision of the Long Term Law is N.J.S.A. 40A:20-12. For *33 projects such as the subject, N.J.S.A. 40:55C-65c(1) provided that, if the annual service charge was based on gross revenue, “the urban renewal corporation ... shall make payment to the municipality of an annual service charge for municipal services supplied to said project, in an annual amount equal to 15% of the annual gross revenue from ... the total project....” The municipality had the option, even if gross revenue could be determined, to use a percentage based on total project cost. If the municipality decided to use total project cost, the statute provided that “the annual service charge shall be a sum equal to 2% of the total project cost....” N.J.S.A. 40:55C-65c.
The parallel provision of the Long Term Law, N.J.S.A. 40A:20-12, permits a municipality to set the annual service charge based on a percentage of annual gross revenue from a project. At the option of the municipality, or where annual gross revenue cannot reasonably be ascertained, the annual service charge may be based on a percentage of total project cost. For a service charge based on annual gross revenue, the statute provides that the percentage “shall not be more than 15% in the case of a low and moderate income housing project, nor less than 10% in the case of offices, nor less than 15% in the case of all other projects.” N.J.S.A. 40A:20-12b(1). For a service charge based on total project cost, the statute provides that the percentage “shall not be more than 2% in the case of a low and moderate income housing-project, and shall be 2% in the case of all other projects.” Ibid. The statute also provides that the financial agreement shall specify that, commencing not earlier than the seventh year of the term of the exemption, and not later than the sixteenth year, the annual service charge “shall be” the greater of the amount determined pursuant to N.J.S.A. 40A:20-12b(1) or a percentage, escalating in stages, of the taxes otherwise due on the value of the land and improvements. N.J.S.A. 40A:20-12b(2).
Based on a comparison of these two statutes, defendants assert that, in enacting the Long Term Law, the Legislature intended to introduce flexibility into the amount of the annual seivice charge, and that, because of the provisions of N.J.S.A. 40A:20-19 (which requires any law repealed by the Long Term Law to be “eon- *34 strued with respect to, and in a manner consistent with” the Ldng Term Law), such flexibility should be read into the provisions of N.J.S.A. 40:55C-65. The amicus curiae, in support of the flexibility argument, cites Sutherland’s treatise on statutory construction for the proposition that a statute affecting the public interest should be interpreted to benefit the public. 2B Sutherland, Statutory Construction §§ 56.01 and 56.04. Here, Sutherland’s comments could support either a statutory interpretation allowing flexibility in the amount of the annual service charge, thereby favoring the public interest in development and redevelopment of blighted, areas, or an interpretation 'construing the amount of the annual service charge strictly, thereby favoring the public interest in having each person or entity pay its share of the tax burden, and favoring the policy of limiting exemptions to those who comply strictly with all requirements for exemption. Sutherland’s general principles,-therefore, do not assist the court.
Both N.J.S.A. 40:55C-65c and N.J.S.A. 40A:20-12b(1) expressly provide that an annual service charge based on total project cost for a development such as the Project “shall be” 2%.
It is well-established that in construing a statute, one must first consider its plain language. [S]uch language should be read according to its ordinary or general meaning, so long as that reading comports with the statute’s legislative intent. If the statute “is clear and unambiguous on its face and admits of only one interpretation, [courts should] delve no deeper than the act’s literal terms to divine the Legislature’s intent.”
[Koch v. Director, Div. of Taxation, 157 N.J. 1, 7, 722 A.2d 918 (1999) (citations omitted).]
The language of both N.J.S.A. 40:55C-65c and N.J.S.A. 40A:20-12b(1) is “clear and unambiguous on its face.” The annual service charge is limited to 2% of total project cost, no more and no less.
When the Legislature intended to introduce flexibility into the Lon^ Term Law, it did so expressly. For example, N.J.S.A. 40A:20-12b(1), provides that the percentage of total project cost for low and moderate income housing “shall not be more than 2%”. Under this statute, a service charge based on gross revenue, “shall not be more than 15%” for low and moderate income housing and “not less than 10% in the case of offices nor less than 15% in the case of all other projects.” Ibid. Neither the phrase “not more *35 than” nor the phrase “nor less than” modifies the 2% service charge payable with respect to the subject project, so that, under N.J.S.A. 40A:20-12b(1), the annual service charge is fixed at 2% of total project cost for developments such as the Project. The language of N.J.S.A. 40A:20-12b(2) does not suggest a different interpretation of 12b(l), because 12b(2) refers to “the amount determined pursuant to paragraph (1) of this subsection and section 11 of this act.” Section 11 of the Act, N.J.S.A. 40A:20-11, requires that a financial agreement include “an appropriate annual service charge schedule” but specifies that the charge “be based upon the provisions of [N.J.S.A. 40A:20-12].”
Legislative history confirms that the Long Term Law permits only a flat 2% annual service charge and not a charge higher or lower than 2%. Prior to enactment of Senate Bill No. 291 as the Long Term Law, the Senate Revenue, Finance and Appropriations Committee amended the Bill to provide that the percentage of total project cost “shall not be more than 2% in the case of a low and moderate income housing project ... nor less than 2% in the case of all other projects.” The Committee’s June 10, 1991 Statement to S. 291 states that “the Bill establishes a flexible in-lieu-of tax formula, which requires a phase-in to full taxation over the period of tax exemption, which may be negotiated between the municipality and the urban renewal entity.” On December 9, 1991, however, the Assembly Housing Committee amended S. 291 by deleting the phrase “nor less than” from the above-quoted provision and inserting the language “shall be,” so that the provision read “shall be 2% in the case of all other projects.” The Legislature enacted S. 291 as amended by the Assembly Housing Committee, thereby rejecting flexibility with respect to the 2% service charge applicable to the Project.
Based upon the preceding analysis, I conclude that the phrase “shall be” 2% is mandatory, in both the Fox-Lance Law and the Long Term Law. As noted above, N.J.S.A. 40A:20-19 requires that the Fox-Lance Law be construed “in a manner consistent with” the Long Term Law. “Shall” in this context cannot be interpreted as directory. See Franklin Estates Inc. v. Edison Tp., 142 N.J.Super. 179, 361 A.2d 53, (App.Div.1976) (holding that *36 shall may be interpreted as directory “where no public benefit ensues and no private right is insured by according the word ‘shall’ an imperative meaning.” Id. at 184, 361 A.2d 53.)
The provisions of the Ordinance and Financial Agreement setting forth the annual sendee charge payable by TPI violate the express limitation contained in N.J.S.A. 40:55C-65c and N.J.S.A. 40A:20-12b(1). This violation is neither minor nor immaterial. By year ten of the fifteen year term of the exemption, the annual service charge will exceed the statutory percentage by a relative 12½%, and, by year fifteen, the service charge will exceed the statutory percentage by a relative 25%. The tax exemption provided by the Fox-Lance Law has been described as “the capstone ... of the statutory Resign.” Tru Urban Renewal Corp. v. Newark, 11 N.J.Tax 63, 67 (Tax 1990). The annual service charge is an essential and core element of the tax exemption scheme. Accordingly, the annual service charge is a significant material term of the Ordinance and Financial Agreement, and deviation from the statutory provisions specifying the amount of the charge constitutes material non-compliance with the statute. Defendants’ contention that only TPI, and not the public, is prejudiced by the excessive annual service charge, even if correct, does not alter or mitigate the significance of this non-compliance.
VI.
Failure To Certify
Plaintiffs second basis for attacking the validity of the exemption granted to TPI is that Jersey City has failed to satisfy its obligations under the Fox-Lance Law or the Long Term Law to certify that the Financial Agreement was entered into and remains in effect. This obligation is imposed in N.J.S.A. 40:55C-65 and N.J.S.A. 40A:20-12. Both statutes provide that no “claim [for exemption] shall be allowed” unless the municipality in which the property is situated “shall certify that a financial agreement ... has been entered into and is in effect.” As set forth above, defendants contend that this requirement of the statute was satisfied by the signing of the Financial Agreement by Jersey *37 City’s business administrator and approval by its assistant corporation counsel. If any further certifications are required, defendants contend that they were provided in the form of the annual certification of exemption by the Jersey City assessor to the county board of taxation, based on inquiries by the assessor to the tax collector’s office to confirm that the exemption is in effect.
Generally, exemptions from taxation, for example, those permitted under N.J.S.A. 54:4-3.6, are determined and administered by the municipal tax assessor. A property tax exemption granted under the Fox-Lance Law and the Long Term Law, by contrast, is conferred by municipal ordinance and administered by the municipal governing body under the provisions of the financial agreement. The assessor is bound by the municipal determination as set forth in the ordinance and financial agreement. Thus, the assessor’s function in connection with such a tax exemption is limited to ascertaining from the municipal governing body that the requirements for continuation of the exemption have been satisfied.
The assessor is obligated by statute to determine assessments and exemptions annually. N.J.S.A. 54:4-35. That an exemption is valid for only one year is emphasized by the inapplicability of the Freeze Act, N.J.S.A. 54:3-26 and N.J.S.A 54:51A-8, to a county board of taxation or Tax Court judgment granting an exemption. In Boys Club of Clifton, Inc. v. Jefferson Township, 72 N.J. 389, 371 A.2d 22 (1977), the Supreme Court held that the Freeze Act does not apply to exemptions and that the duty of an assessor, pursuant to N.J.S.A. 54:4-4.4, to obtain a statement from the owner as to exempt status every three years does not excuse the owner from filing an appeal, even though a judgment had been entered for the prior year.
The certification requirement in N.J.S.A. 40:55C-65 and N.J.S.A. 40A:20-12 does not specify the frequency of the certification. The requirement for the municipal certification is preceded by the clause “the exemption shall be claimed and allowed in the same or a similar manner as in the case of other real property exemptions ...” Because other property tax exemptions are *38 granted on an annual basis, the requirement for municipal certification is consistent with the statutory scheme only if annual certification from the governing body is required, and the certification is provided before the assessor submits the municipal tax assessment list to the county board of taxation pursuant to N.J.S.A. 54:4-35. This procedure will enable the assessor to know whether his or her certification, to be attached to the assessment list pursuant to N.J.S.A. 54:4-36, can state that a property granted tax exemption by the governing body under the Fox-Lance Law or Long Term Law remains entitled to that exemption.
The preceding interpretation of N.J.S.A. 40:55C-65 and N.J.S.A. 40A:20-12 not only is consistent with the statutory procedures applicable to other exemptions but also is necessary in order to attribute meaning to all of the language of N.J.S.A. 40:55C-65 and N.J.S.A. 40A:20-12. Both statutes require that the municipal certification state that the financial agreement “has been entered into” and that the agreement “is in effect.” Unless the statutes are interpreted to require annual certifications, the phrase “is in effect” is surplus verbiage. A court should avoid interpreting a statute in a manner that renders any portion superfluous. Abbotts Dairies v. Armstrong, 14 N.J. 319, 327-28, 102 A.2d 372 (1954).
 The signing of the Financial Agreement by Jersey City did not satisfy the statutory certification requirement. Even if it did, Jersey City has failed to provide any further certifications. The assessor’s certification to the county board of taxation does not constitute the certification by the “municipality” required by N.J.S.A 40A:20-12 or N.J.S.A 40:55C-65. The assessor is not equivalent to the municipality. See Horner v. Township Committee of Ocean Tp., 175 N.J.Super. 533, 420 A.2d 1033 (App.Div.1980). (holding that “[i]n the overall performance of his duties the assessor is undoubtedly an agent of the Legislature” and that the assessor “must comply with certain directions of the county tax board, county tax administrator and the Director of the Division of Taxation.” Id. at 538, 420 A.2d 1033.) The assessor’s status is not altered by the fact that the municipality pays his or her salary. *39 See Haim v. Mayor and Council of South Plainfield Bor., 237 N.J.Super. 558, 568 A.2d 569 (App.Div.1990).
Defendants do not dispute that Jersey City did not provide an annual certification as to the status of the Financial Agreement for tax year 1998 or tax year 1999, or any other year. The City, therefore, has failed to comply with the requirements of the statute. The statute provides that no claim for exemption “shall be allowed” unless the certification has been provided.
VII.
Enjoyment of the Exemption
The final basis for plaintiffs claim that the tax exemption granted to the Project is invalid for tax years 1998 and 1999 is that the entity which received the exemption, and is the party to the Financial Agreement, is not “enjoying” the exemption as required by the New Jersey Constitution. Plaintiff asserts that, as a result of the subleasing and licensing agreements described above, TPI has no active interest in the Project, and does not operate or use the Project so as to derive any benefit from the exemption. Plaintiff relies on the provisions of Art. 8, § 3, ¶ 1 of the New Jersey Constitution which declares the development or redevelopment of blighted areas to be a public purpose and permits exemption from taxation “in whole or in part, for a limited period of time during which the profits of and dividends payable by any private corporation enjoying such tax exemption shall be limited by law.” From this constitutional language, plaintiff contends that the entity which is enjoying the exemption must be the entity which is actually operating the project on the property.
The Constitution does not impose the requirement which the plaintiff infers. The Constitution only requires that the profits and dividends of the corporation “enjoying” the exemption be “limited by law.” Here, TPI’s profits are so limited by the Fox-Lance Law and the Long Term Law. Neither the Constitution nor either Law provides that the entity whose profits and dividends are limited may not permit occupancy and use of the project by *40 others, or that such entity must be actively operating or using the property.
In support of its contention, plaintiff cites provisions of the Fox-Lance Law such as N.J.S.A. 40:55C-44, which defines an urban renewal corporation as one which is qualified to “construct, operate and maintain a project hereunder” (emphasis added). Similar language appeal’s in N.J.S.A. 40:550-44.1 and elsewhere in the Fox-Lance Law. However, other provisions of the Law, such as N.J.S.A. 40:550-52, -54(b) and (d), -55.1(b) and (d) and -62, provide that the urban renewal entity may be the owner or operator of the project. The Long Term Act provides that, pursuant to a financial agreement, an urban renewal entity may “construct, alter, maintain or operate” (emphasis added) specific types of projects. N.J.S.A. 40A:20-4. The purposes of an urban renewal corporation permitted by N.J.S.A. 40A:20-5b include the purpose, when authorized by financial agreement, “to acquire, plan, develop, construct, alter, maintain or operate” projects such as the subject property.
In short, neither the Constitution nor the Fox-Lance Law or Long Term Law requires that the entity obtaining the tax exemption be actively involved in all aspects of construction, operation and maintenance of the property. Consequently, TPI’s entry into a sublease and a license agreement in itself does not require invalidation of the tax exemption granted to the Project. The sublease and license agreement documents do not divest TPI of all obligations with respect to the property, and, as a result, TPI is “enjoying” some benefits of the exemption. Indeed, given the relationship between TPI and the sublessee and licensee, it is evident that TPI, in part directly, and in part indirectly, is enjoying all of the benefits of the tax exemption granted by Jersey City. The sublease and license agreement do not violate the restrictions on transfer of a project contained in N.J.S.A. 40:55C-60 and N.J.S.A. 40A:20-10 or -16. These statutes govern only sales of projects.
Based on the foregoing discussion, I conclude that the tax exemption granted to TPI by Jersey City is not invalidated as a result of the structure of the entities using the Project.
*41 VIII.
Reformation
Defendants assert that, even if the Financial Agreement violates the applicable statutes, the proper remedy is to reform the agreement, not to invalidate the exemption for 1998 and 1999. Defendants cite Marlboro Tp. v. Planning Bd. of Holmdel Tp., 279 N.J.Super. 638, 653 A.2d 1183 (App.Div.) cert. denied, 141 N.J. 98, 660 A.2d 1196 (1995) in support of their position. In this case the Appellate Division determined that the Holmdel Planning Board had unlawfully required from a developer, as a condition for approval of an office center complex, a cash contribution for a fire track and for a recreation center, and a land contribution for a firehouse. The court found that the required contributions
were incidental to and relatively minor factors in an overall package of legally required contributions, and perhaps most significantly, that the contributions were viewed by both parties as justifiable because they were intended to be used by the municipality to address anticipated municipal problems attributable to the proposed development. Moreover, the amount of the contributions was reasonably related both to the costs expected to be incurred and the developer’s respective fair share thereof.
[Id. at 648-44, 658 A.2d 1183.]
After concluding that the Planning Board simply erred as to what contributions were permitted by law, the Appellate Division held that the proper remedy was to delete the contributions and leave the approval otherwise in place. The court distinguished the facts before it from those in Nunziato v. Edgewater Planning Board, 225 N.J.Super. 124, 541 A.2d 1105 (App.Div.1988), which invalidated an approval conditioned on unlawful exactions, on the grounds that the exactions were obtained by “a process which bore all the hallmarks of a public auction intended to obtain the highest possible bid.” Marlboro Tp. v. Holmdel Planning Bd., supra, 279 N.J.Super, at 644, 653 A.2d 1183. The “auction” to which the Appellate Division referred was the negotiations between the applicant and the planning board as to the amount of a contribution for affordable housing. The Nimziato court found that the “intolerable spectacle of a planning board haggling with an applicant over money too strongly suggests that variances are up for sale.” Nunziato, supra, 225 N.J.Super, at 134, 541 A.2d 1105.
*42 I conclude that the Marlboro Tp. decision is distinguishable from the appeals before me based oh the court’s description of the unlawful exactions as a “minor factor” in the package of required contributions. The annual service charge set forth in the Ordinance and Financial Agreement is at the heart of the agreement between TPI and Jersey City. The degree to which the annual service charge exceeds the statutorily permitted 2% is not minor. As set forth above, by year fifteen of the term of the tax exemption, the service charge will be a relative 25% in excess of the amount permitted by statute.
The basic principle applicable to reformation of contracts is that a court, in reforming a contract, may not impose an agreement more favorable to either party than was intended. The purpose of reformation is to effectuate the understanding and intent of the parties where the document does not reflect that understanding or intent. “If the wilting accords with the expressed intentions of one party, the court will not hold him bound by a different contract.” St. Pius X House of Retreats v. Diocese of Camden, 88 N.J. 571, 580, 443 A.2d 1052 (1982). See also Central State Bank v. Hudik-Ross Co., Inc., 164 N.J.Super. 317, 323, 396 A.2d 347 (App.Div.1978). Proof that the contract, if reformed, would express the intent of the parties must be “clear and convincing.” Brodzinsky v. Pulek, 75 N.J.Super 40, 48, 182 A.2d 149 (App.Div.1962). Equity, however, will afford relief if a document “ ‘by means of a mistake of law fails to express the contract which the parties actually entered into.’ ” Id. at 55, 182 A.2d 149 (quoting 3 Pomeroy’s Equity Jurisprudence § 845 (5th ed.1941)).
Here, the intent of the parties, as clearly expressed in the Ordinance and thé Financial Agreement, was that, commencing in year six of the term of the Financial Agreement, TPI pay an annual service charge in excess of 2% of total project cost. TPI’s application proposed an annual service charge of 2% of total project cost. It is reasonable to infer that Jersey City required the escalations in order to grant the tax exemption embodied in the Ordinance and Financial Agreement and that the amounts of *43 the escalations were a subject of negotiation. The process may have been similar to the intolerable haggling denounced in Nunziato, but the result was an agreement between the parties. Defendants have made no factual showing that the Financial Agreement failed to express “the contract the parties actually entered into.” The provision in the Financial Agreement stating that it “shall be governed by” the Fox-Lance Law merely incorporates an express requirement contained in N.J.S.A. 40:55C-59(h), and does not indicate an intention or agreement that the annual service charge set forth in the Financial Agreement must comply with the 2% limit contained in N.J.S.A. 40:55C-65c. Furthermore, notwithstanding the assertions in their briefs, defendants have made no factual showing that the requirement for payments in excess of 2% resulted from a mutual mistake of law as to what N.J.S.A. 40:55C-65 permitted. Finally, defendants have provided no factual basis to support a conclusion that Jersey City would have granted TPI a tax exemption if the annual service charge were limited to 2% for the entire fifteen year term of the Financial Agreement. Under all of these circumstances, reformation of the Financial Agreement, by limiting the annual service charge to 2% of total project cost, is not an appropriate remedy.
IX.
Conclusions
As discussed above, N.J.S.A. 40:55C-65 and N.J.S.A 40A:20-12 require that the tax exemption permitted by the Fox-Lance Law and Long Term Law “be claimed and allowed in the same or a similar manner as in the case of other real property exemptions.” Tax exemptions are narrowly construed, and the party claiming the exemption has the burden of proving qualification for the exemption. These general principles were applied to a claim for exemption under the Fox-Lance Law in B.P.U.M. Development and Urban Renewal Corporation v. Camden, 9 N.J.Tax 490 (Tax 1988) and Tru Urban Renewal Corp. v. Newark, supra, 11 N.J.Tax at 69. In applying the principles to the undisputed facts before me, I conclude that TPI did not qualify for tax exemption *44 for tax years 1998 and 1999 because 1) the escalation above 2% of total project cost set forth in the Ordinance and Financial Agreement constitutes a material violation of the applicable statutory provisions, and 2) Jersey City faded to provide the certifications required by statute. Each of these reasons is an independent basis for denying the exemption.
As a result of my denial of summary judgment on the issues of laches and estoppel, I must withhold the entry of any judgment declaring TPI’s exemption invalid for 1998 or 1999. If I determine that plaintiffs claims are barred by laches or estoppel, then, notwithstanding the deviation of the annual service charge payable by TPI from the statutory requirements, and Jersey City’s failure to certify, I will dismiss plaintiffs appeals and the exemptions will stand. If I conclude that neither laches nor estoppel bars plaintiffs claims, then I will enter judgment declaring the 1998 and 1999 exemptions invalid.
In reaching the foregoing conclusion, I recognize that declaring the exemption invalid for 1998 and 1999 could result in the termination of the exemption. Plaintiff argues that it seeks only to invalidate the exemption for the two years under appeal and that the parties can revive the exemption by future compliance with the statutory requirements — TPI and Jersey City could amend the Financial Agreement to require an annual service charge limited to 2% of total project cost, and Jersey City could provide the appropriate annual certification that the Agreement is in effect. This argument assumes that Jersey City would agree to an amendment to the Financial Agreement.[4] If Jersey City did not agree, then Secaucus could file an appeal seeking to invalidate the exemption for each of the remaining years of the term of the Financial Agreement. The result of any such appeal would be consistent with the outcome of these appeals. However, notwithstanding the potential future consequences of invalidating the 1998 and 1999 exemptions, I must decide the appeals before me based on the facts and law applicable to those appeals.
*45 Plaintiff’s and defendants’ motions for summary judgment are denied. A plenary hearing will be scheduled, limited to the issues of laches and estoppel. Based on my determination of those issues, I will enter judgments in accordance with the rulings set forth above.

 101 Hudson Street Associates, a defendant in a similar appeal filed by Secaucus challenging its Fox-Lance tax exemption, participated in the summary judgment motions as amicus curiae in support of defendants' motions and in opposition to plaintiff's motion. The amicus joined in the arguments advanced by defendants and advanced separate arguments.

 Although TPI's application and the Ordinance refer to a tax abatement, N.J.S.A 40:55C-65 and 40A:20-12 refer to a tax exemption. The terms '‘abatement” and “exemption” are used interchangeably in this opinion.

 I make no ruling as to whether any such amendment would or would not be valid and effective.