JOSEPH P. McGONNELL, PROSECUTOR, v. BOARD OF COMMISSIONERS OF THE CITY OF ORANGE ET AL., DEFENDANTS.

Argued February 20, 1923—Decided June 5, 1923.

1. The power given by statute to the governing body of a municipality to pass ordinances and enact other regulations relating to the various matters entrusted by the legislature to its jurisdiction, carries with it the implication (often expressed in the statute) that such regulations must be reasonable.

2. The burden of proving a municipal regulation unreasonable is on the party asserting it; and every fair intendment is in favor of its reasonable character.

3. Where a municipal by-law or resolution is shown to be unreasonable *in toto*, it is the duty of the court to pronounce it a nullity.

4. A resolution suspending the standing rules of the police department to the extent of depriving the chief of police, an officer holding under statute and ordinance, of substantially all the powers and duties naturally appertaining to that office, *held* unreasonable and set aside.

On *certiorari*.

Before Justices PARKER and BERGEN.

For the prosecutor, *Josiah Stryker*.

For the defendants, *William A. Calhoun*.

The opinion of the court was delivered by

PARKER, J.   The prosecutor is chief of police of the city of Orange, and has sued out this writ to test the validity of a resolution adopted by the board of commissioners of that city, which, as he claims, has the practical effect of excluding him from the performance of the duties of his office, although it does not specifically purport to remove him therefrom. *Certiorari* is the appropriate remedy in such a case. *Murphy* v. *Freeholders of Hudson,* 92 *N. J. L.* 244; *Moore* v. *Bradley Beach,* 87 *Id.* 391.

The office appears to have been created by statute, so far as its essential authority is concerned. The charter of the town of Orange (*Pamph. L.* 1869, *p.* 182 *et seq.*) called for a "marshal" and a suitable number of policemen (section 8, page 185); authorized the council, by ordinance, to establish, regulate and control a day and night police, and to regulate the manner of their appointment and removal, their duties and their compensation. *Id.* 193. In the same year, the council passed an ordinance relating to the police department, and provided therein that the marshal should be designated and known as chief of police. This, of course, was merely another name for the statutory "marshal." See *Bradshaw* v. *Camden,* 39 *N. J. L.* 416. By section 2 it was further provided that the marshal should be "the executive head of the department. It shall be his duty to cause the public peace to be preserved, and to see that all the laws and ordinances are enforced; and whenever any violation thereof shall come to his knowledge, he shall cause the requisite complaint to be made, and see that the evidence is procured for the successful prosecution of the offender or offenders; he shall, also, have charge of the town lock-up."

In 1872, Orange was elevated into a city, the existing charter being retained in all essentials by the act. *Pamph. L., p.* 1097. The so-called "Walsh act" of 1911 was adopted in 1914.

On January 23d, 1917, the board of commissioners of the city of Orange adopted an ordinance entitled, "An ordinance

concerning the police department of the city of Orange." Sections 1 and 2 of this ordinance read as follows:

"Section 1. The officers of the police department are hereby constituted and shall be known as follows:

"*a.* One chief.

"*b.* Such number of lieutenants as may be deemed necessary.

"*c.* Such number of sergeants as may be deemed necessary.

"*d.* Such number of patrolmen as may be deemed necessary.

"*e.* Such number of chancemen as may be deemed necessary.

"Section 2. The duties of the officers and patrolmen of the police department shall be as prescribed by the board of commissioners or if such duties are not prescribed by the board, then as may be prescribed from time to time by the director of public safety."

The ordinance last above mentioned was in force and effect at the time of the appointment of the relator as chief of police of the city of Orange in January, 1921.

The "Home Rule" act of 1917, passed after the ordinance just mentioned, does not seem to effect any particular change in the status. By section 1 of article 16 (*Pamph. L., p.* 359), the governing body is empowered to "make, enforce, amend or repeal ordinances to establish, maintain, regulate and control a police department, and to prescribe and establish *just* rules and regulations respecting such department for the better government and discipline thereof." But that act expressly reserves the existing status as respects "officers, boards and bodies" and provides that "nothing herein contained shall be held to change in any manner the officiary of any municipality, nor to alter the structure of the government now existing therein." Section 25, page 462.

The ordinance of January, 1917, as will be seen above, made no provision for any "captain" of police. In November, 1922, however, the director of public safety undertook to appoint Thomas M. Ryan as captain of police, and in December, no doubt to establish a basis for such appointment, the board passed an ordinance, not here questioned, in which, among other things, a captain of police was provided for.

Ryan seems to claim under this appointment and ordinance, and his status as captain is not here impugned. The attack is specifically on a broad and radical "suspension" of the "rules" of the police department, the effect of which, as claimed, is to leave to prosecutor the mere shadow of the power and duty of his office, transferring the substance to the "police captain." This revision was by resolution of the board, and the question argued is whether this resolution is lawful. An examination of the "suspended" rules, and of those left untouched, will tend to throw light on this question.

The rules now "suspended" provide that the chief of police shall be the chief executive officer, charged with seeing that the laws and ordinances are enforced (the language, we may here note, of the ordinance of 1869); he receives orders from the director of public safety and promulgates orders to the force; makes written reports and recommendations to the director; is responsible for the preservation of the public peace (again the language, substantially, of the ordinance of 1869), and empowered to establish police posts and detail the officers to cover them; is responsible for the good order of the police station and discipline of the force; receives all prisoners and transmits them to the police court; keeps the "criminal docket" and "receipt books" of property found on prisoners, as well as a record of the service performed by members of the force from day to day, reporting all absentees, names of parties arrested and particulars about them; also reporting officers injured on duty; inspects dress and arms of the policemen; reports riots and serious fires; remains at the station at all times during the day unless necessarily called away. These are the duties of which the prosecutor is relieved by the "suspension" of the rules imposing them. It does not appear that anyone else has been charged therewith by any resolution of the board of commissioners or by any written order of the director of public safety.

The duties remaining to him are: to wear full uniform and shield when on duty; to receive insignia and papers of policemen resigning or suspended; to be notified of the

illness of any member of the force; to obtain permission of the director before leaving the city; to transmit to the director charges against any member of the force, and report meritorious service; to investigate and report on derelictions of duty; to detail officers on election day; to study the infantry drill regulations so as to command the force in case of riot, &c.; to tour the city once a week in uniform during the day and in citizen's clothes at night, and inspect the cells at the police station once a day; and tag or inscribe all lost, stolen or other money or property coming into his possession. Oddly enough rule 47, that during the *absence or illness* of the chief of police the director shall execute and discharge his duties, but may delegate them to some other member of the department," was allowed to stand.

From this somewhat lengthy recital it should be sufficiently obvious that prosecutor is left with the mere shell of an office, the kernel having been removed. This operation took place on January 30th, 1922, by a resolution of the board of commissioners. The rules themselves provide that all or any part of them may be altered or suspended by a majority vote at any time by the board of commissioners. But that is merely the control that naturally goes with the power of enactment. The effect of the action is that the chief of police, a public officer, is shorn of substantially all his appropriate duties and jurisdiction; and the stipulated facts show that this was done after the allegiance of the force had been snatched from him and transferred to another. For on December 17th, 1922, less than a week after the new ordinance providing for a captain of police, Ryan, the new captain, posted a bulletin at headquarters stating that he had been placed in charge of the entire department and would occupy the "chief's old office." On the next day, prosecutor was moved into an isolated room without telephone connection, and since that time has been prevented from exercising any practical authority over the force or any members thereof; and no notice has been taken of his protests, oral and written.

It is argued for the city, that the action now challenged was a legitimate exercise by the board of commissioners of

the various statutory powers conferred upon them by law; and we are referred to the cases of *McManus* v. *Newark,* 49 *N. J. L.* 175, and *Gutheil* v. *Nelson,* 86 *Id.* 1, as supporting the action now under consideration. We think that neither case is in point. The first involved merely the transfer of policemen from detective to patrol duty, and the question seems to have been whether this was within a statutory inhibition. The second turned on the power of the municipal authority to appoint other officers of the same rank and to prescribe the appropriate duty for each of them. The matter of reduction in rank was held not to be involved in the decision. In the case at bar we have the head of the police department, next to the director of public safety, deprived of most, if not all, of the duties naturally and essentially belonging to his office, without any charge of disloyalty, incompetency, misconduct or other unfitness.

The power of a city council or other body to pass ordinances relating to the various matters entrusted by the legislature to its jurisdiction, carries with it the implication (expressed in many cases) that such ordinances must be reasonable. Every intendment is made in favor of their reasonable character, and to support them a construction will be placed on them which will make them reasonable rather than unreasonable; but the question of their reasonable character is for the court, which will not hesitate to declare them void if plainly unreasonable. This is familiar law, acted on in a multitude of cases, in many of which the court confined its action to the particular part of the ordinance shown to be unreasonable, leaving the rest to stand. Some of the cases follow: *Long* v. *Jersey City,* 37 *N. J. L.* 348, 351; *Pennsylvania Railroad Co.* v. *Same,* 47 *Id.* 286, 288, in the Court of Errors and Appeals, where Chief Justice Beasley said in the opinion: "If this by-law [ordinance] be subject to this imputation [that it is unreasonable] there can be no doubt that it would be the duty of this court to pronounce it a nullity." *Trenton Horse Railroad Co.* v. *Trenton,* 53 *Id.* 132; *Gaslight Co.* v. *Rahway,* 58 *Id.* 510; *Traction Co.* v. *Elizabeth, Id.* 619; *Wyse* v. *Jersey City,* 68 *Id.* 127; *North*

*Jersey Street Railway Co.* v. *Same*, 75 *Id.* 349; *Neumann* v. *Hoboken*, 82 *Id.* 275; *Schwarz Bros.* v. *Board of Health*, 83 *Id.* 81; *affirmed*, 84 *Id.* 735.

Such being the rule touching an ordinance enacted with due deliberation and solemnity, it cannot sanely be said that any other rule should apply to a resolution which is, in its very nature, of a less formal character.

Looking at the resolution brought up, in the light of what has been said, we have no hesitation in pronouncing it unreasonable *in toto,* and on its very face exhibiting an intent, not to "establish just rules and regulations respecting the police department for the better government and discipline thereof," but to take away from the titular and statutory head of the department the duties naturally and properly appertaining to his office and to transfer them to a subordinate.

The resolution will be set aside, with costs.