225 N.J. Super. 124 (1988)
541 A.2d 1105
WILLIAM NUNZIATO, FILOMENA KELLER A/K/A PHYLLIS KELLER, AND EDWARD ACCIARDI, PLAINTIFFS-APPELLANTS,
v.
PLANNING BOARD OF THE BOROUGH OF EDGEWATER, CONSTRUCTION OFFICIAL OF THE BOROUGH OF EDGEWATER, AND CONSULTINVEST INTERNATIONAL, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 1988.
Decided May 19, 1988.
*126 Before Judges ANTELL, DEIGHAN and LANDAU.
Frederick L. Bernstein argued the cause for appellants.
Philip N. Boggia argued the cause for respondent Planning Board of the Borough of Edgewater (Durkin & Boggia, attorneys; Philip N. Boggia, on the brief).
Ronald J. Picinich argued the cause for respondent Consultinvest International, Inc. (Picinich and Selser, attorneys; Joel *127 P. Serra, Marion B. Solomon and Ronald J. Picinich, on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
In this action in lieu of prerogative writs plaintiffs appeal from a final judgment of the Law Division dated June 30, 1987 validating the action of the Edgewater Planning Board in granting site plan approval to defendant Consultinvest International, Inc. (hereinafter "applicant") for the construction of a high rise condominium apartment building. Approval, granted by resolution dated September 23, 1986, includes variances from the borough's set-back, lot coverage and parking stall requirements. It authorizes construction of a 24-story building consisting of 406 dwelling units on 3.6 acres of land adjoining Gorge Road in Edgewater and .3 acres in the neighboring municipality of Cliffside Park.
On this appeal plaintiffs assert that they were denied an opportunity to be heard before the Planning Board, that in addition to the variances granted the project also required a density variance which was beyond the authority of the Planning Board to grant, that a height variance was also required, that sufficient reasons were not shown for the grant of the front yard and lot coverage variances, that the variances granted significantly impaired the intent and purpose of the zone plan and zoning ordinance and that the resolution was invalid because it was prepared by the Board's attorney and not sufficiently reviewed by members of the Planning Board.
From our careful examination of the record we are satisfied that plaintiffs and their attorneys were given every reasonable opportunity to be heard at the hearings before the Planning Board. We further conclude that no density variance was required. Plaintiffs' contention to the contrary is based on area calculations which make no allowance for the .3 acres of the tract located in Cliffside Park. A somewhat analogous *128 situation was presented in Ciocon v. Franklin Lakes Plan. Bd., 223 N.J. Super. 199 (App.Div. 1988), where we said the following:
We hold that under the facts and circumstances presented, where a boundary line transects a property located within two municipalities, the rear-yard set-back requirements of one municipality refer to the distance that the building is located from the rear-lot line located in the adjoining municipality rather than from the municipal boundary line. [Id. at 208].
There is no reason why the principle there applied to interpret a set-back requirement should not also apply to a requirement limiting lot coverage.
The height limitation of the ordinance is not exceeded by the proposed structure. The ordinance limits the building to a height of 250 feet above "ground floor level." The term "ground level," from which plaintiffs say the measurement should be made, is not used in the ordinance. The lot is steeply sloped with a difference of approximately 50 feet between its high and low points, and the building's height should be measured from its "ground floor level." The ordinance was properly interpreted by the Planning Board.
Affirmative reasons for granting the set-back variances are found in what the Planning Board termed "the unique topographical conditions of the proposed site as well as the testimony submitted concerning the affect [sic] of shadows view blockage of neighboring properties and aesthetic considerations...." Also supported by the evidence is the Planning Board's finding that the variances in this area zoned for high rise construction would not impair the intent and the purpose of the zone plan and zoning ordinance.
Plaintiffs' contention that the Planning Board's resolution was lacking in factually supported findings is lacking in merit. R. 2:11-3(e)(1)(E). Were it not for the issue to which we now turn, the Law Division's judgment would be affirmed.
During the hearing of July 15, 1986 the Chairman of the Planning Board made the following statement to the applicant's counsel:

*129 Which brings to mind, Mr. Rigolosi, since we are on the subject of our requests, if this Board sees fit to grant this I want you to consider our need for affordable housing.
As you know, the state has mandated that most communities in Bergen County have a plan for affordable housing. I think this is a good time for us to start.
I want you to consider  if not on this site, maybe another site in Edgewater  granting us some affordable housing.
If we grant you this project  I don't want you to say anything now  I'm saying that this cannot continue with all of this luxury business without considering the other people that live in this world. Somewhere along the line we have to start. I think this is a good time to start and I'm saying this in front of the owner.
If you can't see fit to put affordable housing on that plot then maybe there's a place in Edgewater you can acquire and put some affordable housing. So just consider that. It may be in the form of a grant to the town.

Whichever way you can go, I'm sure it would be taken into consideration as far as granting this particular approval. [Emphasis supplied].
The matter was further pursued at the final hearing on August 19, 1986 when the chairman reopened the subject:
Mr. Rigolosi, one of the things I pointed out to you was the problem that we're having in Edgewater with the affordable housing, and I was wondering whether there's any way that that could be incorporated with this plan, and you haven't as yet addressed that this evening. However, at the last meeting we suggested that the attorneys get together and discuss something that you could present to us.
Mr. Rigolosi responded that the matter had been explored and that the applicant would be willing to contribute $500 for each unit in the proposed building, a total of $203,000. During the ensuing discussion members of the Board said what they thought about the adequacy of the "contribution," the salient fact holding their attention was the possibility that the project would yield a gross return to the builder of around $200,000,000. One member of the Board speculated that Mr. Rigolosi had given "a low-ball offer," whereupon Mr. Rigolosi replied that he was not playing "a high-ball, low-ball game," and that he had made what he thought was "a generous offer." He said that because of the uniqueness of the matter being negotiated between the applicant and the Planning Board there was no "standard" for him to draw upon and he urged the Board to consider the magnitude of the project. Actually, Mr. Rigolosi *130 "thought that $100 to $200 a unit would be somewhat fair, because when you consider the number of units, that is adding on a considerable sum of money." He told the Board of the "up-front money that is necessary to get this project off the ground ... [the] premium costs that must be incurred to even get this site ready ... a difficult engineering problem," and costs approximating four to five million dollars. He then stated, "If you're talking about $500 a unit, you're talking about $200,000 on top of all of that for the affordable housing." One Board member said "it's a matter of opinion as to what's fair and what's equitable" and that he didn't think $500 was fair. He then proposed, "How about giving us the retail value of one two-bedroom apartment in the building," to which another member added "[o]n the 24th floor." Mr. Rigolosi replied, "[w]hy not a studio apartment?"
We do not overlook the Board members' attempts to elevate the tone of the proceedings by gratuitously interspersing stately protestations that the amount contributed would "have no bearing on our decision" on whether to approve the application and that "only if it is voted approval would something be done of this nature." The matter was concluded by the Board agreeing to accept the applicant's offer of $203,000. Its resolution summarized the agreement in the following language of paragraph six:
... [T]he Planning Board has considered the proposal by this applicant that a sum of money donated by the applicant be set aside for utilization for low and moderate housing in the Borough of Edgewater. The applicant has suggested and the Planning Board has agreed to accept the sum of five hundred dollars ($500) for each of the four hundred six (406) units approved in connection with this development which amount shall be used by the Borough of Edgewater to satisfy its Mount Laurel obligation. This amount shall be paid upon the issuance of a building permit.
Our Supreme Court recently noted that there is "wide variation in the types of exactions that governmental entities impose on developers" such as requiring the construction of streets, or the dedication of land for schools or recreational purposes. N.J. Bldrs. Ass'n. v. Bernards Tp., 108 N.J. 223, 229 *131 (1987). In fact, as the Court observed, some municipalities "have enacted `linkage' ordinances that condition the right to develop commercial properties on construction of or contribution to the cost of low-and moderate-income housing." Id. at 233. However, these impositions must be authorized by statute and implemented by municipal ordinance. Ibid; Longridge Builders, Inc. v. Planning Bd. of Princeton Tp., 52 N.J. 348, 350-351 (1968); West Park Ave., Inc. v. Ocean Tp., 48 N.J. 122, 127-128 (1966); Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, 28 N.J. 423, 441 (1958). In Longridge Builders, Inc. v. Planning Bd. of Princeton Tp., 52 N.J. 348 (1968), the Court invalidated a condition imposed by the Planning Board that the applicant seeking subdivision approval pave an off-site road. Id. at 349. The Court declined to decide whether the Legislature had authorized the contribution for off-site improvements, resting its decision instead on the lack of an ordinance. Id. at 350. The Court reasoned, in language appropriate to this case:
Without an appropriate ordinance setting forth standards and procedures, the planning body would be left with an impermissibly broad range of discretion in exacting off-site improvements from subdividers; landowners and developers would have no basis for planning; and reviewing courts would be without a measuring rod to gauge the validity of the imposition. [Id. at 351].
As stated in Battaglia v. Wayne Township Planning Board, 98 N.J. Super. 194, 198 (App.Div. 1967), in an application for site plan approval "the conditions that may be imposed must be set forth with some particularity in the ordinance and must be limited to those permitted by the authorizing statute." Compare, Matter of Egg Harbor Associates (Bayshore Centre), 94 N.J. 358 (1983), where the Court upheld affordable housing inclusion regulations based upon statutory authority.
West Park Ave., Inc. v. Ocean Tp., 48 N.J. 122 (1966), emphasizes the impropriety of exactions unsupported by statute, ordinance or regulation. Plaintiff owned several lots which were part of a subdivision plan. It was informed by various municipal officials that the Township would issue no more building permits or certificates of occupancy unless plaintiff *132 agreed to pay $300 per house to the Board of Education to defray school costs. Plaintiff paid rather than litigate because it feared that its project could not survive if delayed. Id. at 124. Counsel for the municipality executed a contract upon the payment of each $300. Id. at 124-125. Plaintiff thereafter sued to recover the payments it made, claiming duress. Id. 124. It appealed the trial court's judgment in favor of the municipality.
In reversing, our Supreme Court concluded that the payments were "illegally extorted." Id. at 128. The Court noted:
There being no statutory authorization, it is clear the municipality could not have lawfully exacted the charges here involved. At the oral argument before us, defendants conceded this to be so. We have no doubt the municipality was conscious of the illegality of what it did and for that reason refrained from adopting an ordinance, seeking instead to achieve its ends through the guise of "voluntary" contributions with spurious "agreements" to make them stick. [Id. at 127-128].
In Matter of Egg Harbor Associates (Bayshore Centre), 94 N.J. 358 (1983), it was stated that "State and municipal bodies that have the power to control land use for the health, safety, and general welfare of the public may use that power to create housing opportunities for the poor." Id. at 367. Whether this language authorizes a municipality to provide for the solicitation and acceptance of money in the manner that was done here is a question we do not decide. Assuming that it does provide such authority, it is clear that an implementing ordinance was never enacted and without that the exaction is impermissible. Longridge Builders, Inc. v. Planning Bd. of Princeton Tp., 52 N.J. at 350-351.
The facial difference between the cases discussed above and the matter before us is obvious. There the applicants sought relief from the oppressive actions of the municipalities. Here, the applicant does not. Indeed, it actually insists that its commitment to "contribute" $203,000 to the municipality for affordable housing was voluntarily made, that it was intended as a gift and not to influence the Planning Board's disposition, and that the Planning Board's decision to grant subdivision *133 approval was not affected by the promise of a contribution. The Planning Board vehemently agrees.
The trial court rested its affirmance in part upon the fact that there was "no evidence of fraud or corruption...." Presumably, this was based on the lack of a showing that any member of the Planning Board would enjoy a personal benefit. But the propriety of the variances does not depend upon the finding of fraud or corruption. The test is whether the local body's action was arbitrary, capricious or unreasonable. Rowatti v. Gonchar, 101 N.J. 46, 52 (1985); Kramer v. Bd. of Adjust., Sea Girt, 45 N.J. 268, 296 (1965). In our view, if the agreement to pay $203,000 to the borough for its affordable housing fund was entered into by the applicant to induce the Planning Board to grant approval and was a consideration in the mind of the Board members when they voted approval, such action could not be other than arbitrary and capricious. By this criterion the Planning Board's action must be vacated.
The idea of a contribution was first proposed by the Board chairman himself who said he was "sure" that it would be considered by the Board in connection with the application. We find it impossible to credit the disclaimers dutifully recorded at the hearing of August 19, 1986. At that hearing, the applicant offered $500 per unit, but at least one Board member thought more should be given. The Board and the applicant bargained their way to a mutually acceptable figure; one bargains for a quid pro quo, not for a gift. The Board's resolution itself alludes to the contribution and specifies that it is to be paid "upon the issuance of a building permit." Finally, the applicant itself conceded at oral argument that its "gift" to the Borough would be forthcoming only if the site plan approval and variances were sustained on this appeal. There can be no doubt that the promise to pay $203,000 was a material factor in the application process.
Without legislated standards the possibilities for abuse in such negotiations between an applicant and a regulatory body, *134 no matter how worthy the cause, are unlimited. Approvals would be granted or withheld depending upon the board members' arbitrary sense of how much an applicant should pay. Cases can be visualized in which neighboring land owners file competing applications for site plan approval of shopping center developments and where the applicant promising the larger contribution is granted approval and the other is not. Or others in which a homeowner offers $1000 to obtain a variance, but his neighbor defeats the application by offering $2000. Indeed, if we sanction the propriety of accepting contributions for affordable housing to support a variance application, no reason appears why, in the absence of controls set forth in an ordinance, a contribution to support an objection to the variance should not also be given consideration.
We conclude that the kind of free-wheeling bidding under review is grossly inimical to the goals of sound land use regulation. The intolerable spectacle of a planning board haggling with an applicant over money too strongly suggests that variances are up for sale. This cannot be countenanced. Proceedings in which this has occurred are irremediably tainted and must be set aside.
We understand the applicant's situation. It responded to the Planning Board's prodding, and as a result must suffer loss of its site plan approval and variances. Were the facts in some way different from what they are, we could consider the kind of relief granted in Longridge Builders, Inc., West Park Ave., Inc. and Lake Intervale Homes, Inc. The difficulty is that it does not claim to have been victimized by the Board. Indeed, it insists that its agreement to contribute $203,000 for affordable housing in Edgewater was an act of benevolence on its part, an unconditional gift, not a payment for site plan approval, and that it did not figure in the Board's determination. In view of the findings which we have made, there is no basis to mollify our decision's impact upon the applicant.
*135 The judgment of the Law Division dated June 30, 1987 is reversed and the resolution of the Planning Board dated September 23, 1986 is vacated.