817 A.2d 965 (2003)
358 N.J. Super. 289
BOROUGH OF HALEDON, Plaintiff-Appellant,
v.
BOROUGH OF NORTH HALEDON, and Borough of Hawthorne, Defendants-Respondents, and
K. Hovnanian North Central Acquisitions, LLC, and Summit Point Developers, LLC, Defendants-Intervenors-Respondents. and
New Jersey Board of Public Utilities, Intervenor-Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 10, 2003.
Decided March 17, 2003.
*967 Casey Anne Cordes, Nutley, argued the cause for appellant (Piro, Zinna, Cifelli & Paris, attorneys; Ms. Cordes and James M. Piro, on the brief).
Edward J. Buzak, Montville, argued the cause for respondent Borough of North Haledon (Mr. Buzak, attorney; Mr. Buzak, on the brief).
Michael J. Pasquale, Hawthorne, argued the cause for respondent Borough of Hawthorne.
James J. Shrager, Somerville, argued the cause for respondent K. Hovnanian North Central Acquisitions, L.L.C., and Walter G. Reinhard argued the cause on the Board of Public Utilities issue only (Norris, McLaughlin & Marcus, attorneys; Mr. Shrager and Mr. Reinhard, of counsel; Mr. Reinhard, on the brief).
Paul M. Schneider, Middletown, argued the cause for intervenor-respondent Summit Pointe Developers, L.L.C. (Giordano, Halleran & Ciesla, attorneys; Mr. Schneider, on the brief).
Alex Moreau, Deputy Attorney General, argued the cause for intervenor-respondent New Jersey Board of Public Utilities (David Samson, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Moreau, on the brief).
Before Judges PETRELLA, BRAITHWAITE and LINTNER.
*966 The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiff Borough of Haledon appeals from summary judgment orders entered in favor of the Boroughs of North Haledon and Hawthorne, and certain developers, the intervenors K. Hovnanian North Central Acquisitions, LLC (Hovnanian), and Summit Point Developers, LLC (Summit), requesting enforcement of claimed exclusive water supply rights with North Haledon for three development projects and alleging breach of contract and estoppel remedies. The lawsuit sought to prevent Hawthorne from supplying water to three planned residential developments in North Haledon pursuant to an Interlocal Services Agreement for Water Supply entered into among Hawthorne and North Haledon, and three developers.
While the summary judgment motion was pending, on September 13, 2001, plaintiff Haledon and Hovnanian executed a *968 settlement agreement that resolved the dispute concerning the water supply to the three new residential developments in North Haledon. Haledon appealed from the January 15, 2002 final judgment. Thereafter, the Board of Public Utilities (BPU) successfully moved to intervene in the pending appeal. The BPU asserts that the franchise issue and any ancillary franchise issues should be remanded to it for determination.
Summit is developing a fifty-six unit townhouse community in North Haledon. Hovnanian is developing an adjoining parcel with 287 condominium units and fourteen single-family homes.[1] Anjo Realty, LLC (Anjo) plans to build twenty-five single-family homes on a nearby third site. Purportedly, those developments satisfy North Haledon's affordable housing obligation as established by the New Jersey Council on Affordable Housing (COAH), and presumably without undue burden on the limited resources in the overdeveloped northern area of the State.
North Haledon is not equipped to supply potable water to its residents. Haledon currently supplies water to approximately 1,180 housing units in North Haledon, less than one-half of the town's 2,675 housing units. There are eight housing units in North Haledon already connected to the Hawthorne water system. The remaining North Haledon housing units receive water from private wells. Haledon has never supplied water to the new developments in North Haledon, and previously the new developments had no potable water supply or connection.
Pursuant to a resolution adopted by North Haledon in 1907, Haledon has provided water services for parts of North Haledon where its lines run. The 1907 resolution provided for the laying of pipes in specified areas of North Haledon. As a result of this agreement Haledon became subject to the jurisdiction of reviewing agencies such as the BPU and the New Jersey Department of Environmental Protection (DEP).
Hovnanian claims that of those housing units in North Haledon that obtain water service from Haledon,[2] none receives adequate water that satisfies the BPU's regulations and that the quality of Haledon's water has fallen short of acceptable standards. The BPU and the DEP ordered Haledon to install a chloramination treatment system to correct the presence of trihalomethanes (a carcinogen), install additional water storage tanks, and rehabilitate or replace many components of its water distribution system.
Ten years after the 1907 agreement, the then Department of Conservation and Development [3] approved Haledon's request to extend its water mains further into North Haledon and to build a reservoir and filter plant. On July 6, 1917, North Haledon adopted a resolution supporting Haledon's application to the Board of Conservation *969 and Development based upon public necessity. In addition, the document provided that "all rights and privileges conveyed by this approval are given to the Boro of Haledon alone ..." except that if North Haledon should choose to maintain its own plant, then it had the right to provide a distribution system of its own and purchase the existing system from Haledon.
In the Spring of 2001, representatives of North Haledon and Hawthorne negotiated an agreement for Hawthorne's supply of water to the new residential developments. On May 29, 2001, the Borough Council of Hawthorne voted to approve an Interlocal Service Agreement with North Haledon. The following month, the Borough Council of North Haledon voted to approve the Interlocal Services Agreement for Hawthorne to supply water to approximately 382 homes in the three planned developments. The agreement set forth the parameters under which Hawthorne and North Haledon would construct certain improvements to and expand the existing Hawthorne water system into North Haledon to serve Hovnanian's development, other existing homes adjacent to the new mains within a limited area of North Haledon and to improve service in nearby areas of Hawthorne.
The applicable excerpts set forth Hawthorne and North Haledon's agreement for the water supply to the new residential developments as well as Hovnanian's obligation to indemnify the municipalities against Haledon's potential claim and the right to control the defense against that claim state:
4. WATER SUPPLY BY HAWTHORNE TO NORTH HALEDON.
A. Upon the completion of the System Improvements and approval thereof by Hawthorne prior to the issuance of the first Certificate of Occupancy, Hawthorne agrees to provide public potable water supply service to all users within North Haledon, as set forth in Section 6 below.
B. For the purposes of this Agreement North Haledon grants to Hawthorne the right and privilege to construct or have constructed on its behalf by the Developers herein, the System Improvements in the public roads and ways of North Haledon and the right, privilege, and obligation to maintain, repair and reconstruct the same. In addition, North Haledon grants to Hawthorne the right and privilege to service customers in North Haledon, including those in the Proposed Residential Communities and the residential units along the route of the water mains to be constructed as part of the System Improvements and other additional customers as specifically approved by North Haledon.
5. RATES AND SERVICE BY HAWTHORNE
A. Hawthorne agrees to provide water supply service within North Haledon identical to the service that it provides within Hawthorne. Except as otherwise provided herein, all rates, rules, regulations, conditions and terms of service which apply in Hawthorne shall also apply within North Haledon.
16. INDEMNIFICATION
A(iii) In the specific event of a claim by the Borough of Haledon concerning the rights of North Haledon and/or Hawthorne to enter into this Agreement or fulfill its obligations under this Agreement, for which North Haledon and/or Hawthorne seek indemnification as set forth in Subsection A(i) above ... Hovnanian shall be lead counsel and direct the defense of any such claims ...
Haledon objected to the Interlocal Services Agreement and asserted that it had expended monies to build and upgrade the water system infrastructure in order to *970 meet its contractual obligation to supply water to North Haledon housing units and pending projects were under construction in North Haledon to improve service. Hovnanian maintains that these improvements have been dedicated to the area of town where Haledon already provides service, and are for the sole benefit of existing customers, not the new developments contemplated by the developers. Hovnanian, Hawthorne and North Haledon proposed to construct (and have apparently already constructed) a new water main from Hawthorne's Fairview Avenue water tank, along Manchester Avenue, through the Summit Pointe site into the Hovnanian Property.
Under the Interlocal Services Agreement, Hovnanian was authorized to act as lead counsel and to direct the defense, adjudicate or settle the matter, so long as the settlement in no way affected the other defendants' rights or obligations. Accordingly, Hovnanian and Haledon entered into a settlement agreement on September 13, 2001, resolving the issues between them. The settlement provided that Haledon would withdraw all objections to the Interlocal Services Agreement as it pertained to the three residential communities at issue in the litigation, and would not contest any aspect of the project, thereby enabling Hovnanian and the other two developers to proceed with the construction. In consideration, Hovnanian agreed to pay $500,000 to Haledon if various conditions set forth in the agreement were satisfied, including prompt judicial approval. Both North Haledon and Hawthorne objected to the settlement, claiming that Hovnanian did not have the right to settle because they would be adversely affected.
After argument on the motions, the judge concluded that the settlement amount offered by Hovnanian was an attempt to circumvent proper adjudication of the issues between the municipalities and was "arbitrary, capricious, and subversive of law." The judge set aside the settlement agreement and ordered the return of any monies paid to Haledon by Hovnanian.
In ruling on the summary judgment motions, the judge also held that there was no language in any of the resolutions that established an exclusive franchise agreement between Haledon and North Haledon. The judge said that all Haledon demonstrated in support of the exclusivity claim was the fact that it maintained an ongoing relationship with North Haledon to supply water to a limited area of the Borough. The judge granted North Haledon's motion to amend its counterclaim to add a thirteenth count and granted summary judgment on the issue of exclusivity. The judge dismissed the complaint and the counterclaims in their entirety. The judge also ruled that the Interlocal Services Agreement was valid, and that construction on the new developments could immediately commence, with the water to be supplied by Hawthorne.
Thus, among other things, the final judgment permanently restrained Haledon from interfering with North Haledon's right to enter into a water supply agreement with persons or entities other than Haledon in areas not already served by Haledon; ruled that Haledon does not have an exclusive franchise or right to furnish water to North Haledon; and validated the Interlocal Services Agreement dated May 29, 2001, by and among North Haledon, Hawthorne, Hovnanian, Summit, and Anjo.

I.
The BPU requests that we remand the franchise issue and any ancillary franchise issues to it. Relying on N.J.S.A. 48:2-13(a) and N.J.S.A. 40A:31-23(d), the BPU argues that it has primary jurisdiction *971 to determine whether Haledon has an exclusive or any franchise right to furnish water service to North Haledon. Haledon supports the BPU's position and contends for the first time on appeal that the trial court should have deferred the franchise issue to the BPU's primary jurisdiction. However, Haledon maintains that the settlement agreement is a separate legal issue properly before this court. North Haledon, Hovnanian, Hawthorne, and Summit, take the position that the matter should not be remanded to the BPU because it does not have jurisdiction over the agreement between Haledon and North Haledon.
The BPU is responsible for supervising and regulating public utilities in the State and has the power to set "just and reasonable standards, classifications, regulations, practices, measurements or service to be furnished, imposed, observed, and followed" by a public utility. N.J.S.A. 48:2-13; N.J.S.A. 48:2-25(a). The determination of whether an administrative agency has jurisdiction over a particular matter "is one of statutory construction, that is, determining the legislative intent." Hinfey v. Matawan Reg'l Bd. of Educ., 77 N.J. 514, 529, 391 A.2d 899 (1978).
The BPU relies upon N.J.S.A. 48:2-13(a) for its general jurisdiction over this matter. It states:
The board shall have general supervision and regulation of and jurisdiction and control over public utilities as defined in this section and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this Title.
It is conceded that Haledon is subject to the BPU's jurisdiction under N.J.S.A. 40A:31-23(d), which provides:
(1) Subject to the terms of any agreement entered into by participating local units or between a supplying and receiving local unit or units and the provisions of this act, a local unit or local units owning and operating water supply facilities in accordance with the provisions of N.J.S. 40A:31-4, which supply water to more than 1,000 billed customers within another local unit, shall be subject to the jurisdiction, regulation and control of the Board of Public Utilities in accordance with the provisions of Title 48 of the Revised Statutes. The provisions of this subsection shall not apply whenever water is supplied to customers in another local unit at bulk rates ...
Because Haledon services over 1,000 customers within another local unit, it is not disputed that they are subject to the BPU's jurisdiction. The BPU maintains that its jurisdiction over Haledon is extended by N.J.S.A. 48:2-13(a) to Haledon's "property rights, equipment, facilities, and franchises" located in North Haledon.
The sweeping grant of power to the BPU is "intended to delegate the widest range of regulatory power over utilities to the [BPU]." Township of Deptford v. Woodbury Terrace Sewerage Corp., 54 N.J. 418, 424, 255 A.2d 737 (1969). Furthermore, the BPU's authority over utilities extends beyond powers expressly granted by statute to include incidental powers that the agency needs to fulfill its statutory mandate. A.A. Mastrangelo, Inc. v. Comm'r of Dept. of Envtl. Prot., 90 N.J. 666, 683-684, 449 A.2d 516 (1982); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562, 384 A.2d 795 (1978).
More specifically, the BPU is empowered to direct utilities to "furnish safe, adequate and proper service" and to that end it may fix just and reasonable standards and practices. N.J.S.A. 48:2-23; N.J.S.A. 48:2-25; In re Pub. Serv. Elec. *972 and Gas Co., 35 N.J. 358, 371, 173 A.2d 233 (1961). For example, the BPU may ensure that a public utility charges "just and reasonable rates." N.J.S.A. 48:2-21. N.J.S.A. 48:2-14 expressly provides that in granting approval for franchises, the BPU may impose conditions as to its construction and maintenance as the public convenience may reasonably require.
North Haledon argues that when there is a water supply consent resolution between two municipalities, N.J.S.A. 40A:31-23(d) gives the BPU control over only the supplying municipality, which in this case would be Haledon and Hawthorne. In allowing the BPU to make a determination on the scope of Haledon's water supply franchise, North Haledon contends, the BPU affects North Haledon's ability to sign water supply agreements which involve third parties. Relying on the introductory clause of N.J.S.A. 40A:31-23(d), which states that the BPU's regulation of a supplying municipality such as Haledon is "subject to the terms of any agreement entered into by participating local units or between a supplying and receiving local unit ..." North Haledon and Summit argue that any regulatory control which the BPU has over Haledon is preempted by the 1907 and the 1917 consent resolution agreements between Haledon and North Haledon. Because these resolutions must be analyzed in determining the nature of Haledon's water supply rights, North Haledon concludes that the Superior Court appropriately examined these resolutions.
Relying on In re Complaint By Eugene Rotella, 92 N.J.A.R.2d 48, 1991 WL 432084 (BRC November 19, 1991), and I/M/O Complaint of Morris Tp. v. The Town of Morristown, 49 N.J. 194, 229 A.2d 516 (1967), the BPU argues that N.J.S.A. 40A:31-23(d)[4] has been construed to give it jurisdiction to oversee municipal water companies servicing more than 1,000 customers outside their municipal borders.
Rotella, supra (92 N.J.A.R.2d 48), involved the owner of commercial properties in North Haledon, who challenged the Haledon Water Department's billing policy that property owners, and not their tenants, be responsible for payment of the water bills. The Board of Regulatory Commissioners[5] agreed with the owner and ordered the Haledon Water Department to change its billing policy. The Board found that it had jurisdiction over Haledon with respect to the discharge of a statutory obligation to promote water conservation. The Board noted that, "N.J.S.A. 40A:31-23(d) states that the Water Department is under the jurisdiction of the Board in regard to the adjoining municipalities. As such, the State has preempted the area of water service." Id. (citing N.J.S.A. 40A:31-23(d); Little Falls Tp. v. Bardin, 173 N.J.Super. 397, 414 A.2d 559 (App.Div.1979); and Petition of Hackensack Water Co., 196 N.J.Super. 162, 169-170, 481 A.2d 1160 (App.Div. 1984)).
In Morris, supra (49 N.J. 194, 229 A.2d 516) the Court considered whether the BPU had regulatory power over a municipally owned and operated waterworks and distribution system which furnished water in adjoining municipalities. Id. at 196, 229 A.2d 516. It was uncontested that Morristown *973 had an exclusive franchise to supply water to the residents of adjoining municipalities. Id. at 197, 229 A.2d 516. The Court limited its holding to the specific issue in the case, and found that "when water is supplied to the inhabitants of an adjoining municipality, the BPU has jurisdiction over the terms and conditions under which it is supplied, including the rates charged to such extra-territorial consumers." Id. at 209-210, 229 A.2d 516.
These cases do not support the BPU's argument that it had primary jurisdiction to determine the franchise issue. The BPU had jurisdiction in Rotella because that case dealt with how the Haledon Water Department should bill an owner of commercial properties in North Haledon. Similarly, Morris granted the BPU jurisdiction over the terms and conditions of an existing franchise. The BPU's jurisdiction over billing procedures and the regulating of conditions are statutorily granted. See N.J.S.A. 48:2-21; N.J.S.A. 48:2-13. These cases consider the BPU's jurisdiction to supervise and regulate public utilities in the State and its power to set "just and reasonable standards, classifications, regulations, practices, measurements or service to be furnished, imposed, observed, and followed." N.J.S.A. 48:2-25(a).
Under the statutory scheme of Title 48, the BPU is charged with supervisory functions. However, the present case does not involve a dispute relating to the quality of Haledon's service or the rates that it charges. Rather, the issue is the scope of Haledon's water supply rights in North Haledon, which the BPU does not have jurisdiction to decide.
Primary jurisdiction is defined as the circumstance in which a "court declines original jurisdiction and refers to the appropriate body those issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." Muise v. GPU, Inc., 332 N.J.Super. 140, 158, 753 A.2d 116 (App. Div.2000) (quoting Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 269 n. 1, 390 A.2d 566, (1978)). See Hackensack v. Winner, 82 N.J. 1, 30, 410 A.2d 1146 (1980). In primary jurisdiction, "the case is properly before the court, but agency expertise is required to resolve the questions presented"; by contrast, when a court relies on exhaustion, it "is saying that the case ought to have been brought before the administrative agency in the first place." Id. at 83-84, 410 A.2d 1146. See Village of Ridgefield Park v. New York, S & W Ry. Corp., 318 N.J.Super. 385, 405-407, 724 A.2d 267 (App.Div.1999), modified, 163 N.J. 446, 750 A.2d 57 (2000). One purpose of primary jurisdiction is to allow an agency to apply its expertise to questions which require interpretation of its regulations. Muise, supra (332 N.J.Super. at 159, 753 A.2d 116) (citing IPCO Safety Corp. v. WorldCom, Inc., 944 F.Supp. 352, 357 (D.N.J.1996) and Campione v. Adamar of N.J., 155 N.J. 245, 264, 714 A.2d 299 (1998)). The other main purpose is to preserve uniformity in the interpretation and application of an agency's regulations. Id. at 160, 753 A.2d 116.
In Muise, supra (332 N.J.Super. 140, 753 A.2d 116), we held that a court should defer to an agency's primary jurisdiction only if "to deny the agency's power to resolve the issues in question" would be inconsistent with the "statutory scheme" which vested the agency "with the authority to regulate [the] industry or activity" it oversees. Id. at 160, 753 A.2d 116. We outlined a four prong test:
(1) Whether the matter at issue is within the conventional experience of judges;
(2) Whether the matter is peculiarly within the agency's discretion, or requires agency expertise;

*974 (3) Whether inconsistent rulings might pose the danger of disrupting the expertise; and
(4) Whether prior application has been made to the agency.
Ibid. (citing Boldt, supra (320 N.J.Super. at 85, 726 A.2d 975)). However, the primary jurisdiction doctrine is not invoked when the claim is outside the agency's jurisdiction, or when the remedy for such a claim is outside the agency's power. Id. at 160, 753 A.2d 116. Muise noted that:
[w]hether a claim presents some issues that are within an agency's special expertise and others which are not, proper course is for the court to refer the former to the agency, and then to apply the agency's findings or conclusions to its determination of the remaining issues. [Id. at 161, 753 A.2d 116]
The BPU relies upon Boss v. Rockland Electric Co., 95 N.J. 33, 40, 468 A.2d 1055 (1983), which concerned a longstanding utility easement where a utility company sought to cut down certain trees on residential property, rather than trim and prune them, as it had done in the past. Id. at 36-37, 468 A.2d 1055. To fully understand the terms of the easement originally granted to the utility, it was necessary to interpret the provision in the easement that granted the utility the right to "cut and keep cut" the trees. Id. at 38, 468 A.2d 1055. The utility argued that this meant to cut down entirely, while the plaintiffs maintained the language meant to trim and prune the trees. Id. at 38-39, 468 A.2d 1055. The Chancery Judge made a site inspection and conducted a plenary trial in an attempt to ascertain the parties' intent based upon the language of the easement and its conflicting provisions.
The Court acknowledged that "[w]hen the legal rights of parties are clear, it is unjust and unfair to burden them with an administrative proceeding to vindicate their rights." Id. at 40, 468 A.2d 1055. However, where evidence is to be taken, and findings of fact to be made, the Court considered that the administrative body statutorily charged with that function should perform that function. Id. at 40-41, 468 A.2d 1055. The Court remanded for the trial court to refer the factual questions "as to what is reasonably necessary for the proper maintenance of the utility system." Id. at 41-42, 468 A.2d 1055. These findings and recommendations were then to be submitted to the trial court to apply the BPU's findings against the legal issues to be resolved. Id. at 42, 468 A.2d 1055. The Court held:
that where the resolution of a contested legal issue properly brought before a court necessarily turns on factual issues within the special province of an administrative agency, the court should refer the factual issues to that agency. The trial court should accept the factual determinations of the agency and lay them against the legal issues to be resolved and enter its final judgment resolving the mixed questions of law and fact based upon the agency fact finding.
Ibid.
This case is distinguishable because Boss required administrative expertise regarding conflicting terms of the easement and the grant. Here, unlike Boss, there are no conflicting provisions in the language of the 1907 and 1917 consent resolutions. There is a clear legal issue. No regulatory issue is presented here which involves the BPU's statutory charge to ensure that a utility provides safe, adequate, proper and environmentally sound service or which requires agency expertise. The four prong test from Boldt, supra (320 N.J.Super. at 85, 726 A.2d 975), has not been satisfied. This case raises only questions about whether the 1907 and 1917 resolutions granted Haledon an exclusive *975 right to provide water in North Haledon. The interpretation of these resolutions was well within the province of the Chancery Judge here and does not require agency expertise. Although this question was raised before the BPU in February 2001, it was neither argued before the BPU, nor addressed in the BPU's decision. There has been no ruling by the BPU concerning this issue, and thus, there is no danger of inconsistent rulings. Therefore, the issue was properly before the court.

II.
At the outset, we note that Haledon argues that the judge did not have sufficient legal basis to set aside the settlement agreement because none of the parties moved to set it aside. However, in Hawthorne's opposing certification to Haledon's motion for dismissal of certain aspects of the Complaint, it also cross-moved seeking a determination that the settlement agreement between Haledon and Hovnanian be deemed unenforceable.
The settlement agreement provides that in return for a payment of $500,000 to Haledon by Hovnanian, Haledon agrees to withdraw its assertion of a right of exclusivity. In setting aside the settlement agreement, the judge determined that the exaction of a $500,000 payment in exchange for the dismissal of a lawsuit was a prohibited quid pro quo.
There is a strong public policy favoring settlement of litigation. Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990) (citing Jannarone v. W.T. Co., 65 N.J.Super. 472, 476, 168 A.2d 72 (App. Div.), certif. denied, 35 N.J. 61, 171 A.2d 147 (1961)). Absent compelling circumstances, settlement agreements are enforced by our courts. Ibid. In Pascarella v. Bruck, 190 N.J.Super. 118, 124, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983), we noted that "an agreement to settle a lawsuit is a contract which, like all contracts, may be freely entered into and which a court, absent a demonstration of fraud or other compelling circumstances, should honor and enforce as it does other contracts." Id. at 124-125, 462 A.2d 186. Before vacating a settlement agreement, our courts require "clear and convincing proof" that the agreement should be vacated. DeCaro v. DeCaro, 13 N.J. 36, 97 A.2d 658 (1953).
"An agreement is against public policy if it is injurious to the interest of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or, as it is sometimes put, if it is at war with the interests of society and is in conflict with public morals." Odatalla v. Odatalla, 355 N.J.Super. 305, 314, 810 A.2d 93 (Ch.Div. 2002) (citing Garlinger v. Garlinger, 129 N.J.Super. 37, 40, 322 A.2d 190 (Ch.Div. 1974), modified, 137 N.J.Super. 56, 347 A.2d 799 (App.Div.1975)).
The motion judge relied upon Nunziato v. Planning Bd. of the Borough of Edgewater, 225 N.J.Super. 124, 541 A.2d 1105 (App.Div.1988) and Township of Marlboro v. Planning Bd. of the Township of Holmdel, 279 N.J.Super. 638, 653 A.2d 1183 (App.Div.), certif. denied, 141 N.J. 98 (1995), in determining that the exaction of a $500,000 payment in exchange for the dismissal of a lawsuit was a prohibited quid pro quo.
In Nunziato, supra (225 N.J.Super. 124, 541 A.2d 1105), we overturned a site plan and variance grant made by the Planning Board of Edgewater Borough on grounds that the Board, in granting the approvals, had illegally considered a cash payment offered by the developer-applicant to the Borough's affordable housing fund. Id. at 130, 541 A.2d 1105. The *976 Board's actions were arbitrary and capricious because they involved negotiations for exactions which were "unsupported by statute, ordinance or regulation." Ibid. If the agreement to pay money to the borough for its affordable housing fund was entered into by the applicant to induce the Planning BPU to grant approval, we reasoned, such action could not be other than arbitrary and capricious. Id. at 133, 541 A.2d 1105. We ultimately concluded that such action is grossly inimical to the goals of sound land use regulation and had to be set aside. Ibid.
Likewise, in Marlboro, supra (279 N.J.Super. 638, 653 A.2d 1183), we considered the consequences of illegal exactions obtained by a municipal land use planning agency from a developer during the application approval process. Id. at 640, 653 A.2d 1183. However, although the contributions were illegal, because the parties acted in good faith, and the contributions bore a reasonable relationship to the municipal burdens created by the development, we concluded that it was not arbitrary. Id. at 646, 653 A.2d 1183. We distinguished Nunziato on the basis that the illegal exaction constituted a "... blatant quid pro quo for the approval ... in which ... the amount thereof is entirely arbitrary." Id. at 643, 653 A.2d 1183.
Haledon argues that these cases are inapplicable to the instant litigation because they are land use approval cases and the judge erred in relying upon these cases for the "quid pro quo" standard to support her decision to vacate the settlement agreement.
The motion judge considered that she was asked to determine whether the settlement constituted an exaction or a quid pro quo. Relying on Marlboro and Nunziato she set aside the settlement, and stated:
[t]his attempt by Hovnanian and the Borough of Haledon to circumvent proper adjudication or full resolution of the issues between the two municipalities is clearly arbitrary, capricious, and subversive of law. The payment does not reflect compensation for any legitimate concern that the Borough of Haledon may have because the monies are not directed to address any of the needs of the water utility at issue. There is no nexus between the payment of the settlement funds and the resolution of any of the issues here.
Here, under the settlement agreement, in exchange for a payment of $500,000, Haledon temporarily, and in a limited area, relinquished its alleged right of exclusivity under the Interlocal Services Agreement, so Hovnanian and the other developers could proceed to complete the developments. The developer defendants intervened because the outcome of the case would affect the developments at issue. Hovnanian also filed a counterclaim against Haledon for tortious interference with contractual relations, violating the New Jersey Constitution and frivolous litigation.
We reverse the order vacating the settlement of $500,000. There is no basis to vacate such a settlement. The cases relied upon by the motion judge do not support such a conclusion. This is not a case where a developer is before a planning board for an approval and the board seeks to extract certain off-tract improvements or money for off-tract improvements as a quid pro quo for the approval. Here, there was a claim by Haledon that it had an exclusive right to provide water to North Haledon. Haledon's complaint sought compensatory damages. This clearly meant that Haledon claimed it would lose money if it did not continue to provide all the water services to the residents of North Haledon. The claims included one for money damages. The *977 settlement, by payment of $500,000 by Hovnanian in settlement of the disputed issue as between them was amenable to compromise and settlement. Moreover, that settlement would not preclude the court from resolving the issue of exclusivity.

III.
In granting summary judgment to North Haledon, the judge determined that Haledon did not have an exclusive franchise to supply water to North Haledon, but only a limited privilege to do so. Haledon submits and relies on the 1907 and 1917 resolutions to argue that the issue involves contractual rights, and that it has an exclusive franchise to provide water services to North Haledon. Haledon also argues that the judge failed to address the long-term relationship between the parties. However, the history of the parties neither creates a material issue of fact, nor changes the terms of the consent resolutions.
Haledon's primary contention is that the 1907 resolution grants it an exclusive right to provide water to the residents of North Haledon. "[T]he rules of construction which apply to statutes and municipal ordinances apply equally to municipal resolutions." Levine v. Mayor of the City of Passaic, 233 N.J.Super. 559, 564, 559 A.2d 485 (Law Div.1988) (quoting McGonnell v. Comm'rs of Orange, 98 N.J.L. 642, 121 A. 135 (E & A 1923)). Those principles require that a resolution should be interpreted to "`effectuate the legislative intent in light of the language used and the objects sought to be achieved.'" Merin v. Maglaki, 126 N.J. 430, 435, 599 A.2d 1256 (1992) (citation omitted). The first step of statutory construction requires an examination of the language of the resolution. Bergen Comm'l Bank v. Sisler, 157 N.J. 188, 202, 723 A.2d 944 (1999). The meaning derived from that language controls if it is clear and unambiguous. Ibid. If the text, however, is susceptible to different interpretations, the court considers extrinsic factors, such as its purpose, legislative history, and context to ascertain the legislature's intent. Wingate v. Estate of Ryan, 149 N.J. 227, 236, 693 A.2d 457 (1997); Lesniak v. Budzash, 133 N.J. 1, 8, 626 A.2d 1073 (1993). Thus, the resolutions are to be interpreted and read according to their plain meaning without addition or embellishment. Levine, supra (233 N.J.Super. at 563-564, 559 A.2d 485).
The 1907 resolution states that North Haledon granted to Haledon (then known as the Township of Manchester):
... the privilege and the right of laying mains, pipes, and conduits, with necessary attachments, through that part of the High Mountain Road or Belmont Avenue in the Borough of North Haledon, beginning at the Dolberry Farm on said road, South to the dividing line between the Township of Manchester and the Borough of North Haledon, and also the right of laying pipes, mains and conduits with necessary attachments, in, under, and across Jackson Street in said Borough, be granted to the Township of Manchester ... under the following conditions...
Six conditions followed this paragraph.
This agreement does not mention an exclusive right to provide water to the entire Borough of North Haledon. Instead, Haledon was granted permission to place water lines beneath specifically named streets. In addition, the language of this agreement shows that North Haledon's consent was contingent upon Haledon satisfying the six specified conditions.
The 1917 consent resolution is also geographically limited and does not mention *978 an exclusive franchise. The 1917 resolution allowed Haledon to lay water mains in another portion of North Haledon, specifically:
... in the High Mountain Road, the Old High Mountain Road, and Squaw Brook Road, to connect with its water main now laid within said Borough of Haledon, upon obtaining consent of the Board of Chosen Freeholders of the County of Passaic for that purpose, said roads being county Roads.
Again, Haledon was granted permission by this resolution to place water lines beneath specific named streets, not an exclusive right within the entire Borough.
In denying Haledon's claim of exclusivity, the judge found:
With the exception of the use of the word franchise, at one point in the various enabling ordinances between Haledon and North Haledon and the Public Utilities Commission of the State of New Jersey, the Court sees no language in any of the agreements that establishes an exclusive relationship between Haledon and North Haledon. This Court has reviewed the agreement that all the parties are relying upon and finds nothing which gives that kind of control to Haledon with regard to the Borough of North Haledon.
In fact, there are provisions in that agreement for what will happen if North Haledon decides to take over its own water supply, indicating a contemplation by the defendants that the relationship of the parties has the probabilitynot just the possibility, but the probability for change.
In granting summary judgment on Count XIII of North Haledon's counterclaim, the judge stated:
Haledon, as the party with the burden of proof, [h]as failed to provide this Court with substantial facts to establish their claim or even raise an issue for trial. All they have told this Court is that there has been an ongoing relationship pursuant to this 1907 agreement, and that they have always provided North Haledon's water. It has always been that way, and that is the way it should continue.
In all same breath, however, they say that they will allow North Haledon to get water from somebody else if they can control the circumstances. Haledon's position is inconsistent with the argument of exclusivity.
....
There is no exclusive franchise agreement between the Borough of Haledon and North Haledon that would require the injunction of any action by North Haledon or the payment of damages.
We are satisfied that the motion judge properly granted summary judgment to North Haledon on Count XIII of its counterclaim because there is no provision in either resolution between the boroughs that provides for the exclusive supply of water by Haledon to North Haledon, and such a provision cannot be inferred. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). In view of our determination that the motion judge properly granted summary judgment on this ground, we need not address respondents' additional arguments supporting the contention that Haledon does not have an exclusive franchise.
We reverse the vacation of the settlement agreement. In all other respects, we affirm the balance of the order granting summary judgment.
NOTES
[1] We were informed at oral argument that all of the water supply facalities have been constructed and connected to Hawthorne's water supply lines. A number of units are under contract of sale to residential purchasers. All that is required is that water supply valves be turned on. An earlier appeal entitled In the Matter of Petition of Haledon for Permission to Install a Water Main in the Borough of North Haledon, docket number A-3791-00, was dismissed as moot on March 19, 2002, because a disputed water pipe had already been installed.
[2] We were also advised at oral argument that Haledon purchases the water it uses, and which it seeks to supply to the new developments in North Haledon, from the Passaic Valley Water Supply District. Hence, Haledon acts as a middleman or broker of water.
[3] Now the DEP. See Transfer of Functions, Powers and Duties, N.J.S.A. 13:1D.
[4] As amended by L. 2002, c. 47. At oral argument the BPU argued that the recent amendment to this statute gave it jurisdiction in other cases, including whenever water is delivered outside municipal boundaries. We do not read this statute as so providing, and reject the BPU's argument.
[5] Now the Board of Public Utilities. See Transfer of Functions, Powers and Duties, N.J.S.A. 13:1B.